Rita Sanders GEIER et al., Plaintiffs,

The United States of America,
Plaintiff-Intervenor,

Raymond Richardson, Jr., et al.,
Plaintiff-Intervenors,

v.

Ray BLANTON et al., Defendants.

Civ. A. No. 5077.

United States District Court,
M. D. Tennessee,
Nashville Division.

Jan. 31, 1977.
Judgment Feb. 28, 1977.

George E. Barrett, Nashville, Tenn., for plaintiffs.

J. Stanley Pottinger, Asst. Atty. Gen., Nathaniel Douglas, Atty., Justice Dept., Washington, D.C., and Charles H. Anderson, U. S. Atty., Nashville, Tenn., for plaintiff-intervenor.

Avon N. Williams, Jr., Nashville, Tenn., Jack Greenberg, and Drew S. Days, III, New York City, for plaintiff-intervenors Richardson and others.

Brooks McLemore, Atty. Gen., William J. Haynes, Jr., Asst. Atty. Gen., Nashville, Tenn., for defendants.

MEMORANDUM

FRANK GRAY, Jr., Chief Judge.

As detailed *infra*, this lengthy litigation[1] culminated with a month-long evidentiary hearing (September 20 to October 20, 1976). At its conclusion the various parties were allowed time within which to submit proposed findings of fact.

The original plaintiffs filed a brief statement in lieu of detailed findings; however, Plaintiff-Intervenor United States and Plaintiff-Intervenors Richardson *et al.*, filed

1. *See Sanders v. Ellington*, 288 F.Supp. 937 (M.D.Tenn.1968), and *Geier v. Dunn*, 337 F.Supp. 573 (M.D.Tenn.1972).

separate detailed proposed findings. There were two proposed findings of fact submitted by the defendants. The Attorney General of Tennessee filed such proposals for all State defendants except the University of Tennessee and its Board of Trustees, and the University of Tennessee, through private counsel, filed its proposals.

This action was originally filed by the plaintiffs, both white and black citizens of the State of Tennessee, to enjoin the proposed construction and expansion of the University of Tennessee-Nashville Center. The plaintiffs alleged, *inter alia*, that Tennessee Agricultural and Industrial State University, now Tennessee State University (hereinafter referred to as TSU), was originally established under State statute [2] as a State public higher education institution for the education of blacks, which statute was prima facie evidence of racial discrimination; that TSU was being maintained by State officials as a segregated black institution contrary to the Fourteenth Amendment to the Constitution of the United States; that appropriations for TSU were not provided on a basis equal to those of the State's predominantly white institutions; and that the new construction and expansion of the predominantly white University of Tennessee-Nashville Extension Center would serve to perpetuate TSU, also located in Nashville, as a segregated black institution which would ensure the continued existence of a dual system of public higher education in Tennessee. Based on the foregoing reasons, and others, the plaintiffs requested that the State be enjoined from expanding the Nashville Extension Center, from providing unequal educational facilities, and from maintaining racially segregated institutions of higher education in Nashville.

Subsequently, the United States moved to intervene in the action. The United States joined the plaintiffs in their allegations and requested relief, and, in addition, the United States requested that the State officials be required to formulate and submit to the Court a plan of desegregation designed to eliminate the dual system of public higher education in Tennessee. On July 22, 1968, the Court granted the motion of the United States for leave to intervene as a party plaintiff.

After a hearing conducted on August 19, 20 and 21, 1968, the Court delivered an opinion from the Bench, which opinion was followed by an Order on August 22, 1968, denying the requests of the plaintiffs and plaintiff-intervenor, the United States, to enjoin the proposed construction and expansion of the University of Tennessee-Nashville Center (hereinafter referred to as UT–N), but requiring the defendants to formulate and submit to the Court, by April 1, 1969, a plan designed to dismantle the dual system of higher education in Tennessee, with particular attention to TSU. In its opinion, filed in written form on August 23, 1968, *Sanders v. Ellington*, 288 F.Supp. 937 (M.D.Tenn.1968), the Court found that a dual system of higher education had been established by law in Tennessee and that it had not been dismantled; that progress toward desegregating the traditionally white institutions in the eight years of an open-door policy had been slow as shown by the percentages of black enrollment ranging from .6 percent to about 7 percent at the individual universities; [3] that TSU still had a black enrollment in excess of 99 percent; and that the record at that time did not indicate that the proposed construction and operation of UT–N would necessarily perpetuate a dual system of higher education. [4]

---

**2.** The statute cited by the plaintiffs was T.C.A. § 49–3206, which stated that the purpose of TSU was " . . . to train negro students in agriculture, home economics, trades and industry, and to prepare teachers for the elementary and high schools for negroes in the state."

**3.** At the time, Memphis State University enrolled the largest percentage of black students for the traditionally white institutions; approx-

imately 7 percent of its total enrollment was black. *Sanders v. Ellington*, 288 F.Supp. 937, 940 (M.D.Tenn.1968).

**4.** After enumerating the purposes behind the proposed physical expansion of UT–N, the Court said:

"There is nothing in the record to indicate that the University of Tennessee has any intention to make the Nashville Center a de-

In reaching its decision, the Court did not find that the State's higher education officials had been guilty of any unconstitutional acts in the recent past, with emphasis on "recent." However, in light of "mistakes and inequities in the past," the Court held " . . . that there is an affirmative duty imposed upon the State by the Fourteenth Amendment to the Constitution of the United States to dismantle the dual system of higher education which presently exists in Tennessee." *Id.*, at 942. Noting that "the failure to make A & I [TSU] a viable, desegregated institution in the near future is going to lead to its continued deterioration as an institution of higher learning," the Court reiterated that the requested desegregation plan should place special emphasis on the desegregation of TSU. *Id.*, at 943.

On April 1, 1969, the defendants filed a document styled "Plan for Desegregation of Higher Education Facilities in Tennessee." With respect to the desegregation of the State's traditionally white institutions, the Plan of 1969 stated generally the defendants' commitment to increase the number of black students, to establish close working relationships with the officials of predominantly black high schools, to set aside financial aid for minority students, to advise potential black students of the availability of financial aid programs, to conduct on-campus orientation programs for black students, and so on. With respect to the desegregation of TSU, the Plan of 1969 proposed that the defendants would recruit both white students and white faculty members for TSU, that the physical appearance of TSU would be upgraded to make it more attractive to students of all races, and that the defendants would give concentrated attention to developing and publicizing academic programs which would attract white and black students to TSU. The defendants decided that the best method of

desegregating the two Nashville institutions, TSU and UT–N, would be to establish joint, cooperative, and exclusive program arrangements between the two institutions. The Plan did not specify any of the proposed program arrangements.

On December 23, 1969, the Court entered an Order on the defendants' Plan of April 1, 1969. In that Order the Court concluded that the defendants' Plan could be neither approved nor rejected. Specifically, the Court determined that "[t]he plan as submitted lacks specificity, in that there is no showing of funds to be expended, no statement of the number of students to be involved and, most importantly, no time schedules for either the implementation of the projects or the achievement of any goals." Also, the Court reiterated its previously expressed conclusion " . . . that the State does have a Constitutional duty to dismantle any State-supported dual system of education, at any level." The defendants were directed to formulate and submit to the Court, on or before April 1, 1970, a report showing precisely what steps had been taken to implement each proposal in the Plan of 1969, including setting forth specific projected time schedules for such implementation.

The defendants filed the Court-ordered report on April 1, 1970. In general, the report stated that the black enrollment at the traditionally white institutions increased 42.2 percent, from 2,720 in 1968–1969 to 3,869 in 1969–1970, with most of the increase occurring on the freshman undergraduate level; that the percentages of black student enrollment in the individual senior institutions ranged from .8 percent to 10.2 percent; that the percentage of black faculty for all institutions had increased very little, from .4 percent to .9 percent; and that the amount of financial aid utilized by black students had increased substantially. With respect to the Nashville

gree-granting day institution. On the contrary, the record clearly indicates and the court finds that, in its expansion program for the Nashville Center, the University of Tennessee seeks only to provide a quality continuing education and public service center for

Nashville and Middle Tennessee with overwhelming emphasis being placed upon the provision of educational opportunity for employed persons of all races who must seek their education at night." *Id.*, at 941.

situation and TSU, the report stated that the white student enrollment at TSU decreased from 45 to 44; that there had been no significant increase in the number of white faculty at TSU (10 to 11); and that the defendants had failed to reach an agreement on the proposed joint UT–N–TSU engineering program. Subsequently, on June 14, 1971, the defendants filed another report showing that, while some more limited progress had been made by most of the predominantly white institutions in recruiting minority students, officials at the predominantly white institutions had not made any real progress in attracting black faculty. The report further showed that TSU was still overwhelmingly black with its percentage of 99.7 percent black undergraduates and 99.9 percent black freshman during the academic year 1970–1971, but that the State placed some hope for progress in a joint engineering program between UT–N and TSU and a cooperative effort with UT–N, TSU, and Middle Tennessee State University (MTSU) for the Specialist in Education degree, which programs had been agreed upon by the relevant institutions.

Following a hearing on the progress, or lack thereof, evidenced by the reports summarized above, on February 3, 1972, the Court entered a Memorandum Opinion and Order, in which it concluded that the traditionally white institutions were "proceeding to dismantle their dual system of higher education, taken as a state-wide whole, at a constitutionally-permissible rate of speed," but that the TSU "phenomenon" remains. *Geier v. Dunn*, 337 F.Supp. 573, 580 (M.D. Tenn.1972). In regard to TSU the Court found: "First, the approach heretofore adopted by the state has not worked and, indeed, appears to contain no prospect of working. Second, the constitutional viola-

tion which the present racial composition of that institution [TSU] constitutes is of a severe and egregious nature." *Id.*, at 581. The Court ordered the defendants to submit to the Court by March 15, 1972, "a plan . . . to provide, *as a minimum*, for the substantial desegregation of the faculty at TSU and the allocation to the campus of TSU of programs which will *ensure* [emphasis in original], in the opinion of defendants, a substantial 'white presence' on the campus." The Court further ordered the defendants to consider additional methods to desegregate TSU and to report such additional methods to the Court by August 1, 1972. Specifically, the Court required that the report consider the feasibility of a merger or consolidation of TSU and UT–N and the feasibility or non-feasibility of curriculum consolidation of undergraduate and graduate programs offered by the State's colleges in the general Nashville area. *Geier v. Dunn*, 337 F.Supp. 573 (M.D.Tenn. 1972).

On March 27, 1972, following an extension, the defendants filed an interim plan for increasing the white presence on TSU's campus, pursuant to the Court's Order of February 3, 1972. Both the plaintiff and the plaintiff-intervenor United States filed objections to the defendants' interim plan. The Court entered an Order, on June 15, 1972, reserving final consideration of the defendants' interim plan proposals pending the filing of the previously ordered August 1, 1972 report. Pursuant to the Court's Orders of February 3, 1972, as amended on March 10, 1972, and June 15, 1972, the Tennessee Higher Education Commission (hereinafter referred to as THEC), the Board of Education [5] and the TSU defendants filed a report, which included, among other things, separate recommendations by THEC and TSU.[6] The UT–N defendants filed a separate report on August 1, 1972.[7]

---

5. When this lawsuit was initiated, the State Board of Education was the governing board for Tennessee State University. Subsequently, the Board was dissolved and the State Board of Regents took its place to oversee all institutions of higher education outside of the University of Tennessee System.

6. After noting that there had been little progress in the desegregation of TSU's student body, THEC stated that competition with UT–N and possibly MTSU was TSU's main problem. While ruling out merger as unfeasible at the present time, THEC said merger might at some point be the way to complete the desegregation

7. See note 7 on page 648.

On July 31, 1972, a motion to intervene as additional parties plaintiff was filed by Raymond Richardson and others as black students, parents and faculty seeking relief from alleged racial discrimination and segregation in Tennessee's public institutions of higher education. The intervening plaintiffs also sought preliminary and permanent injunctive relief against the proposed creation of campuses for the Shelby State Community College in Shelby County, Tennessee, on the ground that such action would result in racially segregated community college campuses.[8] By Order of February 23, 1973, intervention on behalf of Raymond Richardson, *et al.*, was granted, but the intervenors were denied leave to file a desegregation plan.

On February 14, 1974, the defendants filed a document styled "Progress Report: Equal Opportunity in Tennessee's Colleges and Universities; Fall 1973." On February 15, 1974, the Court issued an Order, finding that the Progress Report of February 14, 1974, ". . . indicates to the Court that the progress reported therein has been minimal particularly at Tennessee State University in Nashville." The Court directed the defendants to submit to the Court, on or before March 8, 1974, an interim plan to be implemented for the 1974–1975 school year. In addition, the Court directed the defendants to submit, on or before August 1, 1974, a long range plan for desegregating Tennessee's public institutions of higher educa-

tion; the Court also granted all other parties the right to submit a plan or suggestions by the same date.

Subsequently, the defendants submitted interim plans on April 1, 1974. THEC and the State Board of Regents[9] submitted a joint interim plan; the University of Tennessee submitted a separate interim plan. The interim plan submitted by THEC and the State Board of Regents contained the following statement:

"Because of inability to resolve the basic differences between UT and Tennessee State about the future role of UT in Nashville, the defendants have been unable to reach interim agreements about program allocations, about the development of cooperative programs, or of other steps that involve joint action which would be designed to speed up integration in Nashville. In view of this, . . . the Higher Education Commission has prepared a statement which recommends action by the Court to bring about an exclusive program allocation to Tennessee State by the Fall of 1974."[10]

Accordingly, THEC and the State Board of Regents recommended that, as an interim measure, responsibility for undergraduate engineering, undergraduate education or graduate education programs in the Nashville area be assigned exclusively to TSU. Objections to all the defendants' plans were filed by all plaintiffs, and UT filed objec-

---

process. Instead of merger, THEC advised that exclusive program allocation was mandatory, and specifically suggested that all teacher education be moved to TSU. TSU's statement lauded merger under TSU as the only way to achieve desegregation.

**7.** After discussing merger and ruling it out, the UT–N report stated that program consolidation was the best way to facilitate desegregation, specifically using cooperative programs. No exclusive program assignments were called for in the report.

**8.** On May 8, 1973, these intervening plaintiffs filed a motion for injunctive relief to prohibit the creation of two campuses in Memphis (one at the suburban Penal Farm site and one at a Mid-Town site) for Shelby State Community College (SSCC). After a hearing on the pro-

posed injunction, this Court, by Order of June 20, 1973, enjoined the defendants from construction of a campus of SSCC at the Penal Farm site. The Court found that ". . . immediate construction of both the Mid-Town and the Penal Farm campuses would be constitutionally impermissible as tending to promote segregation in the State's public institutions of higher learning and would be violative of defendants' affirmative duty to dismantle the dual system of public higher education in Tennessee." (Memorandum and Order, June 20, 1973, at 10–11.)

**9.** *See* note 5, *supra*.

**10.** The statement referred to the disagreement discussed above in notes 6, 7, and accompanying text, *supra*.

tions to the plan of the other defendants. UT's objections condemned the exclusive assignment to TSU of any programs currently offered by UT–N, and UT's plan reiterated a commitment to desegregate the Nashville area through the use of joint and cooperative programs.

A hearing was conducted on the defendants' interim plans and the objections and counter-proposals of the plaintiff-parties on April 16, 1974. On April 19, 1974, the Court issued an Order requiring that the offering of graduate education courses at UT–N be terminated at the conclusion of the 1973–1974 school year, and that TSU have the exclusive right to offer such courses in Nashville for the next school year.[11] The Court took this action after determining that "[w]ith respect to TSU, the parties to this action, with the exception of the defendant University of Tennessee, agree that the most essential and effective approach to interim amelioration of segregation at that institution is the exclusive allocation of programs to it."

The defendants filed their Long Range Plan on July 25, 1974.[12] Regarding the desegregation of the Nashville area, the defendants' Long Range Plan proposed in general that the defendants continue to utilize joint, cooperative and exclusive program arrangements. Additionally, the Long Range Plan projected goals and timetables for the enrollment of black students and the employment of black faculty for all institutions. On or about July 31, 1974, the plaintiff-intervenors, Raymond Richardson, et al., filed the "Plan for the Dismantling of Tennessee's Dual System of Public Higher Education," in which the plaintiff-intervenors established goals and timetables for

black student enrollment, the employment of black faculty and administrators, and the desegregation of Tennessee's higher education governance structure. With respect to the Nashville area the plaintiff-intervenors, Raymond Richardson, et al., proposed that UT–N be absorbed by TSU. Subsequently, on October 11, 1974, the original plaintiffs filed the "Long Range Plan of Original Plaintiffs," in which they proposed that UT–N and TSU be merged into one institution with TSU as the surviving institution. Responses to the defendants' Long Range Plan were filed by both plaintiff-intervenors, condemning the plan as ineffective for achieving desegregation. The response of the United States, filed on October 10, 1974, was in effect a fourth plan calling for merger of TSU and UT–N over a period of five years with TSU resulting as the dominant institution.

On May 20, 1975, the defendants filed a "Progress Report on Implementation of Desegregation Plans," and, on February 13, 1976, the defendants filed their "Desegregation Progress Report."[13] This last progress report describes the progress, or lack thereof, achieved since the submission to the Court of the Long Range Plan, which Plan has been implemented by the defendants.

On or about June 21, 1976, the defendants filed a "Motion for Summary Judgment," urging the Court to grant their Motion on the sole basis of the progress shown in their Desegregation Progress Report. The Court denied the defendants' Motion and set the case to hear final proof on "the progress heretofore made towards eliminating the dual system and the prospects for the success of the plan now in effect as compared

---

**11.** A motion, filed by the University of Tennessee defendants, to stay the effectuation of the Court's Order pending appeal was denied by the Court on July 2, 1974. The appeal was dismissed by UT on July 31, 1974.

**12.** Defendants' Exhibit No. 10. The complete style of that document was "Long Range Plan for Achieving Additional Desegregation of Public Higher Education in Tennessee." Henceforth, unless otherwise indicated, the term "Long Range Plan" refers to this plan. The

defendants also include, as part of their Long Range Plan, the Progress Report, filed February 13, 1976 (defendants' Exhibit No. 11), and the minutes of the Monitoring Committee meetings (defendants' Exhibit No. 12). See note 13 and accompanying text, infra.

**13.** Henceforth, unless otherwise indicated, the term "Progress Report" refers to the "Desegregation Progress Report" dated February 15, 1976.

to the proposed results for any proposed plan." That hearing was held during the period of September 20, 1976, through October 20, 1976.

The primary issue before the Court is whether the defendants have met their constitutional duty to dismantle the dual system of public higher education in Tennessee. Since this system consists, on the one hand, of the predominantly white institutions across the State, and, on the other hand, the overwhelmingly black Tennessee State University, and since all of the proposed remedies are addressed to these two prongs of the problem, the Court will consider separately the state-wide and Nashville situations.[14]

In its 1972 opinion, *Geier v. Dunn, supra,* this Court found that, with respect to the state-wide system of predominantly white institutions, the defendants' "present programs and policies would appear to satisfy constitutional requirements as to these schools." *Id.,* at 581. This conclusion was based on the finding that significant progress in attracting black students had been made by the white institutions and that black enrollment at these institutions had increased on a regular basis between 1968 and 1972. Although approving the defendants' policies, the Court found some disappointing results in the ability of the white institutions to attract black faculty members.

The Progress Report filed in February, 1976, reveals that the steady increase in black enrollment at the predominantly white institutions has continued. The Report shows the following regular progression of black enrollment in terms of percentages of total enrollment:

|  | 1969 | 1970 | 1971 | 1972 | 1973 | 1974 | 1975 |
|---|---|---|---|---|---|---|---|
| Without TSU | 4.6 | 5.2 | 5.8 | 6.7 | 7.1 | 8.8 | 9.7 |
| With TSU | 9.5 | 9.6 | 9.8 | 10.3 | 10.7 | 11.9 | 12.6 |

(Progress Report, February 13, 1976, p. 134.)

Efforts to increase black faculty at these predominantly white institutions have been less productive. Over 55 percent of the black faculty members are employed at two

**14.** The previously reported opinions in this case have dealt with two prongs of the State's problem, the state-wide system consisting of the predominantly white institutions, and the peculiar situation in the Nashville area. On the one hand, the Court found that, at the time of its 1972 opinion, the defendants were making acceptable progress in attracting blacks on a state-wide basis; on the other hand, the Court found that no progress was being made in the Nashville area where one predominantly white institution stood alongside an overwhelmingly black institution. *Geier v. Dunn, supra.*

Since the Court's 1972 opinion, at least one case has dealt with the general approach to be taken in higher education desegregation actions. In *Adams v. Richardson,* 156 U.S.App. D.C. 267, 480 F.2d 1159 (1973), the Court of Appeals, sitting *en banc,* decreed that the problem of desegregating higher education must be dealt with on a state-wide basis rather than a school-by-school basis. At first glance, this case appears to conflict with the approach taken previously by this Court, since its opinions in effect considered the State's problem two-pronged. However, the Adams opinion went on to recognize that any good state-wide plan must give special attention to black institutions:

"A predicate for minority access to quality post graduate programs is a viable, coordinated state-wide higher-education policy that takes into account the special problems of minority students and of Black colleges. . . . [T]hese Black institutions currently fulfill a crucial need and will continue to play an important role in Black higher education." *Id.* at 1164–65.

In Tennessee, the sole black institution, TSU, is the heart of the dual system and warrants special attention. As this Court said in 1972:

"[T]he phenomenon of a black Tennessee State, so long as it exists, negates both the contention that defendants have dismantled the dual system of public higher education in Tennessee, . . . and the contention that they are, in any realistic sense, on their way toward doing so." *Geier v. Dunn, supra,* at 576.

institutions, Shelby State Community College in Memphis and TSU.[15] However, the progression of black faculty since 1969 shows a small, but steady, increase:

|  | 1969 | 1971 | 1973 | 1974 | 1975 |
|---|---|---|---|---|---|
| Without TSU | 1.1 | 1.4 | 2.4 | 2.8 | 3.1 |
| With TSU | 5.9 | 5.3 | 5.7 | 5.7 | 5.9 |

(Progress Report, February 13, 1976, p. 140.)

Moreover, the record shows the difficulties in recruiting black faculty members due to demand in other state and private institutions which are able to offer more lucrative positions.[16]

Since the predominantly white institutions are continuing to make steady progress, the Court finds it unnecessary to evaluate the specific policies and goals contained in the Long Range Plan. The Court expects, however, that the Monitoring Committee will function as outlined in the Plan and will call to task any institution which does not achieve steady progress. This Court will retain jurisdiction so that, should the state-wide progress be abated, it may consider specific State policies as they relate to the decline in progress.

Although the white institutions are making steady progress toward desegregation, the process of dismantling the dual system of higher education in Tennessee is complicated by the peculiar situation in Nashville. As discussed above, this case was originally filed to block the construction and the expansion of the predominantly white University of Tennessee at Nashville on the

grounds that UT–N's mere existence alongside Tennessee State University served to perpetuate TSU as a segregated black institution and ensured the continued existence of the dual system of higher education in Tennessee. In its 1968 opinion, this Court dismissed for the time being the allegation that the two institutions were involved in a competitive situation which fostered dualism. Noting UT–N's overwhelming emphasis on evening education for the employed, the Court determined that the existence and expansion of UT–N would not "necessarily perpetuate a dual system of higher education," and, indeed, might play an important role in establishing a unitary system. *Sanders v. Ellington, supra*, at 941.

At the time of this Court's 1968 opinion, TSU's student body was over 99 percent black. While, as discussed above, the predominantly white institutions began to make relatively slow but steady progress in terms of black enrollment under the Court's order to take affirmative action, TSU was making no progress in attracting white students. Ruling on the State's first plan for desegregation, filed on April 1, 1969, and its

---

**15.** The Report shows that, out of a total of 389 black faculty members in 1975, 190 were employed by TSU and 24 were employed by Shelby State Community College (Progress Report, February 13, 1976, p. 140).

**16.** The record shows that the same problems exist in the recruitment of black administrators. These problems are further complicated by the fact that administrators often are promoted from the faculty. Some progress, however, is demonstrated by the Progress Report which states that, between 1974 and 1975, ". . . the number of black persons in institutional administrative posts increased about 18 percent statewide, from 9.8% to 10.7%

while the total number of administrators increased only about 7%." Furthermore, the Report states that "[i]f TSU is excluded from the calculation, then the number of black administrators increased 22.5 percent between Fall, 1974, and Fall, 1975, or from 71 in Fall, 1974, to 87 in Fall, 1975." (Progress Report, February 13, 1976, p. 12.) The distribution of black administrators among the defendants' institutions is similar to black faculty distribution. In 1975 the defendants employed a total of 172 black administrative personnel; 97, or 56 percent, were employed by TSU and Shelby State. (*Id.*, at 142.)

subsequent progress reports, the Court determined in 1972 that the plan's approach to TSU and to the Nashville situation was not working, since 99.7 percent of TSU's undergraduate enrollment and 99.9 percent of its entering freshmen were black. Moreover, the Court noted that 81 percent of TSU's faculty was black during the 1970–1971 period. *Geier v. Dunn, supra,* at 576.

Today, over 60 years after the State's establishment of TSU as an institution for negroes and over 8 years after the Court's initial mandate to desegregate, TSU's student population is still overwhelmingly black. The February 1976 Progress Report reveals that the enrollment at TSU in fall, 1975, was about 85 percent black and about 12.2 percent white. However, the proportion of whites on the main campus had not changed since the previous year and remained at about 7 percent, leading to the conclusion that a great number of the white students enrolled at TSU were actually taking courses in off-campus centers, since over 80 percent of the students in these centers were white. (Progress Report, February 13, 1976, pp. 38, 42, 48.) Progress was reported in the area of faculty recruitment, as black faculty at TSU dropped to 68.84 percent of the total. (*Id.,* at 43.) By way of contrast, since the filing of this suit, while UT–N has grown from a small extension program of the University of Tennessee at Knoxville to a degree-granting institution with full campus status (from 1,788 students to 5,828 students), UT–N has remained predominantly white with 12.7 percent total black enrollment in the fall, 1975. (*Id.,* at 37.) Black faculty at UT–N did not advance in 1975; the percentage dropped from 4.3 percent in 1974 to 4.1 percent in 1975 with the number of black faculty members remaining at five. (*Id.,* at 43.)

The Court now finds that the existence and expansion of predominantly white UT–N alongside the traditionally black TSU have fostered competition for white students and thus have impeded the dismantling of the dual system.

The competition for white students between the two four-year degree-granting institutions was recognized early by the Tennessee Higher Education Commission in a report filed on July 31, 1972, which stated in part:

"The only successful large scale desegregation of formerly black institutions has come by attracting adult, largely part-time commuting students, mostly enrolling in evening classes. This is the type of students that U.T. Nashville has been developed to serve, and U.T. Nashville provides the biggest competition to Tennessee State in its efforts to attract white students." (THEC Report, July 31, 1972, p. 4.) [17]

The best evidence of the competitive nature of the Nashville situation is found in the similar programs offered by both institutions. A comparative list of some of the common programs offered by the two Nashville institutions are as follows:

| TSU Programs | UT-N Programs |
| --- | --- |
| Nursing | Nursing |
| Engineering (specialized) [18] | Engineering (general) |
| Undergraduate Education | Undergraduate Education |
| Arts and Science | Arts and Science |
| Business Administration (within school of education) | Business Administration |
| Fine Arts/Music | Commercial Arts/Music |

These programs have remained predominantly one-race at each institution. For example, in the fall of 1976, TSU's Department of Arts and Sciences had a total enrollment of 1,629 students, of which 1,590, or 97.6 percent, were black; UT–N's Division of Arts and Sciences had a total enrollment of 1,895 students, of which 1,521, or 80.3 percent, were white. For the same period, TSU's Department of Business Ad-

17. THEC's report also notes that Middle Tennessee State University also offers substantial competition to TSU in the attraction of white students. (THEC Report, p. 4.)

18. Although testimony was offered at trial to distinguish the specialized engineering course from the program in general engineering, this Court is not convinced that they are entirely different programs.

ministration enrolled 800 students, of which 785, or 98.1 percent, were black; UT–N's Division of Business Administration enrolled 2,098 students, of which 1,828, or 87.1 percent, were white. (Defendants' exhibits numbers 36, 61 and 68.)

The defendants have sought repeatedly to show that the two schools are not competing institutions because UT–N was established to serve working adults who wish to attend college on a part-time basis after 4:00 p. m., while TSU was established as a land-grant institution to serve the traditional younger college student.[19] In deciding this case, the Court must recognize that, up to this date, the pattern of student enrollment in Nashville has been that white students have overwhelmingly enrolled at UT–N, as part-time evening students, and that black students have overwhelmingly enrolled at TSU as daytime students. This pattern of enrollment does not appear to be just coincidental but appears to be a vestige of the former state-imposed dual system of public higher education in the State of Tennessee. Moreover, even if the average student profile at UT–N shows that those students are older and are employed, these are the kind of white students that THEC and Dr. Elias Blake,[20] witness for the United States, say that TSU must attract if it is to prosper. (THEC Report, July 31, 1972; testimony of Dr. Elias Blake.)

The competition for students between UT–N and TSU is roughly paralleled by the situation in Memphis several years ago which was described extensively by Dr. Cecil Humphreys, former president of Memphis State University (hereinafter referred to as MSU). About the same time that the University of Tennessee Board of Trustees initiated its Nashville Center, it opened a comparable extension center in Memphis, where courses were offered during the evenings primarily for working adults, which courses could be used for credit at an ac-

credited institution. In the 1950's, MSU, which had been operating prior to the initiation of the UT–Memphis Center, began to offer evening programs at its own campus, located four to five miles from the UT Center. At the hearing, Dr. Humphreys stated that MSU and the UT Center were in competition for students and that MSU was handicapped in its ability to compete because a UT degree had greater prestige. As was stated in a history of the later established Joint University Center: "For reasons unknown to many but understandable by a few, many University of Tennessee downtown students drove past the Memphis State University Campus to take classes." (Plaintiff-Intervenor Richardson's Exhibit No. 44, "THE JOINT UNIVERSITY CENTER: A NARRATIVE ON ITS HISTORY AND PRESENT STATE OF REPAIR," p. 2.) In the 1960's MSU established a center downtown close to the UT Center and was able to thwart the granting of resident center status to UT, which would have made the center more attractive to students. Concern was expressed about the duplication of programs offered at the two institutions, which concern eventually resulted in the establishment of a Joint University Center in which MSU plays the primary role.[21]

It is clear from the above discussion that the growth of UT in Memphis was cut off by MSU's efforts to attract a large part of the evening students in Memphis. The Court expresses no opinion as to whether TSU officials were at fault in not expanding their programs to compete with UT–N, as did MSU, or as to whether UT–N's existence kept TSU from so expanding. However, the fact remains that UT–N and TSU are in competition for students just as were MSU and the UT–Memphis Center. With TSU's black history and UT's prestige, this competition inevitably fosters dualism.

19. Defendants' exhibits numbers 28, 66; additional exhibit requested by intervening plaintiffs conveyed to Court by letter of November 4, 1976, from Mr. Thomas Wardlaw Steele, UT counsel.

20. President of the Institute for Services to Education, Washington, D.C.

21. See Plaintiff-Intervenor Richardson's exhibits 43 and 44.

In its 1972 opinion, the Court charged the defendants with the responsibility of allocating programs to TSU which would ensure a substantial "white presence on the campus." Specifically, the Court pointed toward the duplicative nursing program at UT–N and the UT School of Social Work then housed at UT–N as examples of programs to consider. Furthermore, the Court recognized that the foregoing action would not result in the adequate desegregation of TSU and ordered the defendants to consider additional methods for desegregation, including the feasibility of merger and of curriculum consolidation of the Nashville institutions. *Geier v. Dunn, supra.* After finding that the defendants' interim plans ordered by the Court in its previous opinions had not been effective in desegregating TSU, the Court, on February 15, 1974, directed the defendants to file a new interim plan for 1974–1975 and a long range plan for the State. All of these orders were, for the most part, attempts by the Court to do something about the competition for white students in the Nashville area. The Court now finds that, with respect to the Nashville area, the defendants' plans have not produced the desired result.

From the first plan filed by the defendants through the Long Range Plan now in effect, the defendants have sought to achieve the ordered progress at TSU by utilizing certain joint and cooperative programs between UT–N and TSU (sometimes also Middle Tennessee State University and Austin Peay), and by providing exclusive program assignments for the two Nashville institutions. The record clearly shows that this approach "has not worked and, indeed, appears to contain no prospect of working." *Geier v. Dunn, supra,* at 581.

It appears appropriate for the Court to review the record with respect to the success or lack of success of the joint, cooperative and exclusive programs which have been implemented.

The Long Range Plan defines a joint program as one leading to a joint degree in which some of the course work must be done at one institution and some at another, and in which the faculty of both institutions are involved in planning and teaching.[22] Only two programs included in the Long Range Plan meet this definition.

The first of these programs, the joint degree in general engineering between UT–N and TSU, is admittedly a failure. The program was put into effect in 1971 and was reevaluated in 1976. The report, prepared by the Ad Hoc Committee on the TSU/UT–N Joint Engineering Program and presented to the Monitoring Committee on September 13, 1976, concluded that the program had not attracted significant numbers of TSU students, and was, therefore, never effective in enhancing the white presence on that campus. The Committee attributed the program's failure to the differences in clienteles at the two institutions and the differences in academic calendars between TSU and UT–N (TSU is on the semester system while UT–N is on the quarter system). The Committee recommended that the program be terminated.[23]

The only other joint program as defined in the Long Range Plan is a joint masters in public administration between UT–N, TSU and MTSU. At the hearing it was learned that the first class had been enrolled for fall, 1976, with TSU being designated as the first coordinating institution. Although this program is new and cannot therefore be evaluated fully as to its impact, the Court must take notice of the problems encountered with the joint engineering program discussed previously.

---

22. Defendants' Exhibit No. 1, Long Range Plan, part 3, p. 2.

23. Defendants' Exhibit No. 8, Report of the Ad Hoc Committee on the TSU/UT–N Joint Engineering Program, p. 2. The Committee recommended that the following be instituted: that UT–N have the sole responsibility for the baccalaureate general engineering program and

that TSU have the only specialized undergraduate engineering programs; that UT–N students not be permitted to take more than 24 of the 32 quarter hours required in each technical elective in specialized areas; that TSU develop a masters of engineering; and that UT–N develop a masters of engineering administration. *Id.,* at 3.

These two problems are present with any joint program involving UT–N and TSU, so the Court must find that the prospects for the program's success are not good.

Cooperative programs are defined by the Long Range Plan as programs which make it easier but do not require students to take work on both campuses, by facilitating student exchange of credits. In these programs the institutions may also agree to cooperate in other ways such as in the exchange of faculty.[24] Although these programs are defined, no cooperative academic credit programs involving both UT–N and TSU are identified.[25] The February 1976 Progress Report discusses several proposed noncredit programs such as inservice-type programs for teachers, career education conferences, workshops, and the like, but the Report does not describe these programs with specificity or show how these programs have contributed or will contribute to the desegregation of either campus. The record thus shows that the joint or cooperative programs have had no appreciable impact on the desegregation of TSU.

The exclusive programs provided by the defendants are divided into two types: (1) those "exclusively" assigned to TSU during the day with UT–N having the opportunity to offer them after 4:00 p. m.; and (2) those programs offered at only one of the institutions. As noted above, with reference to the fall, 1976, statistics,[26] the programs which are "exclusively" assigned on the basis of time offered are overwhelmingly black at TSU (ranging from 97.6 percent black in the Arts and Science program to 87.1 percent black in the engineering program), and predominantly white at UT–N (ranging from 90.9 percent white in the engineering program to 79.8 percent white in the undergraduate education program). With reference to some of those courses that are offered only at TSU, the Criminal Justice Program is 95.3 percent black, and Allied Health (excluding nursing)[27] is about 80 percent black.[28] The only truly successful exclusive program is the graduate teacher education program which was given exclusively to TSU by Court Order on April 19, 1974, because an agreement to do so could not be reached among the parties.[29] The record shows that the exclusive graduate teacher education program at TSU is the only program which has been able to attract a substantial number of white students. In the fall of 1973, before TSU was assigned exclusive responsibility for the graduate teacher education program, TSU enrolled 67 white students in its graduate program. In the fall of 1976, two years after the exclusive assignment, the racial composition of the program was approxi-

24. Defendants' Exhibit No. 10, Long Range Plan, part 3, p. 2.

25. There is a cooperative agreement for the Education Specialist Degree between MTSU, Austin Peay and TSU.

26. Defendants' exhibits numbers 5, 36, 61 and 68.

27. Nursing is the only program which is offered by both institutions on a non-exclusive basis, as both programs operate during the day. These programs show more integration than the exclusive programs discussed previously. The 1976 statistics reveal that UT–N's nursing program is 75.1 percent white (including prenursing), while TSU's program is 63.2 percent black, according to Dr. Bond's testimony, or 70.9 percent black, according to Defendants' Exhibit No. 36. See note 28, infra; defendants' exhibits numbers 5, 36, 61, 68.

28. Defendants' Exhibit No. 36 shows the enrollment of the Allied Health program, excluding nursing, as 77.4 percent black with 144 blacks out of a total of 186. Dr. Frederick Humphries testified that this exhibit represented tentative enrollment data for fall, 1976, which were acquired from the heads of the various programs in time for the hearing, and it included no figures for Health Care, Administration, and Planning. Dr. Andrew Bond, Dean of the School of Allied Health, presented a slightly different breakdown of students, which included the Health Care program, stating that the School of Allied Health, excluding nursing, was 84.6 percent black, with 209 blacks out of 247 students enrolled. See Defendants' Exhibit No. 5.

29. See discussion, supra, at pp. 648–649.

mately 313 blacks (53 percent) and 275 whites (47 percent).[30]

Thus, the Court finds that two programs account for the majority of TSU's white enrollees: the exclusive graduate education program and the off-campus centers program. As noted above, the February 1976 Progress Report states that the percentage of white students on campus remained at 7 percent in the fall of 1975, while the total number of whites enrolled increased to 12.2 percent in 1975. This conclusion that most of TSU's whites are still in the off-campus centers can also be drawn from TSU's tentative enrollment figures for 1976.[31]

From the foregoing discussion, it appears to the Court that the State's approach utilizing joint, cooperative and exclusive program planning has not eliminated the competition between UT–N and TSU, and past failures leave little hope for future progress. The hope for future progress is further dimmed by the historical inability of the defendants to agree among themselves as to the proper course of action, and by the reluctance of the politically powerful University of Tennessee to take significant steps to eradicate dualism in Nashville.

Both the division between the boards governing UT–N and TSU and the power of the University of Tennessee System is demonstrated at the outset by counsel for the defendants. From the beginning, the University of Tennessee and its Board of Trustees have retained their own counsel. In the initial stages of the action, UT was represented by in-house counsel; in the latter stages, private counsel was retained by the System. The remaining defendants, including the Board of Regents as the governing board of TSU (before 1972, the Board of Education), and the Tennessee Higher Education Commission (the central

governing board) have been represented by the Attorney General for the State of Tennessee, whose duties include, *inter alia,* the defense of "any and all suits . . . in any of the district courts of the United States held in the state of Tennessee, in which suit or suits the state may be a party, or in which the state has or may have interests of a pecuniary nature." T.C.A. § 8–610 (1973).

The division among the defendants appeared most destructive after the Court's 1972 opinion requiring the allocation of courses to TSU that would ensure a white presence on campus, and a feasibility study of merger and curriculum consolidation. THEC filed a report on July 31, 1972,[32] suggesting that, while merger was not appropriate at that time, the competition for white students between TSU and UT–N could be ameliorated by assigning all teacher education in Nashville exclusively to TSU. TSU filed a separate statement on the same date calling for merger under TSU, while UT filed a statement on August 1, 1972, rejecting merger under either institution and suggesting cooperative-type programs as the primary means for achieving desegregation.

In April, 1974, the disagreements were heightened by the submission of separate interim plans. Reporting that it could not resolve differences about the role of UT in Nashville, THEC suggested that undergraduate engineering, undergraduate education, or graduate education be moved exclusively to TSU by Court order.[33] The University of Tennessee also filed an interim plan which rejected merger as an alternative and said of the exclusive program allocation proposed by THEC:

"However, proposals for such assignments advanced by the THEC staff have

**30.** Defendants' Exhibits Nos. 36, 68; report of Drs. Reeves and Witherspoon of TSU to the Monitoring Committee, included in Defendants' Exhibit No. 12. Dr. Frederick Humphries' testimony was unclear as to whether these 1976 figures included off-campus whites enrolled in the graduate teacher education program. If they were not included, the percentage of whites to the total number enrolled might well be higher than 47 percent.

**31.** *See* Defendants' Exhibit No. 36.

**32.** *See* discussion, *supra,* at pp. 647–648.

**33.** *See* discussion, *supra,* at pp. 648–649.

placed the entire burden of desegregation on UT–N, without regard to other middle Tennessee institutions." UT Interim Plan, April 1, 1974, p. 2.

On April 10, 1974, the University of Tennessee espoused further its opinions on exclusive program allocation:

"The University of Tennessee does believe that the allocation of *new* programs between or among middle Tennessee institutions is a promising way to promote further desegregation. . . .

" . . . .

"The University of Tennessee stands ready to work with the Tennessee Higher Education Commission and the State Board of Regents in developing a plan for assignment of future exclusive programs . . . but does not accept the discontinuance of existing programs at the University of Tennessee at Nashville as a viable method for desegregating the TSU campus." U.T. Objections, April 10, 1974, pp. 6, 8.

Thus, although the agreement has been reached to implement the Long Range Plan and a spirit of greater cooperation among the defendants was apparent at the recent hearing of this case, the Court takes notice that program allocations have, for the most part, followed the wishes expressed by the University of Tennessee. Although the graduate teacher education program assigned to TSU by the Court Order has been the most successful program in terms of racial impact, the Long Range Plan does not contemplate any proposal for similar allocations in the other areas proposed by THEC.

Most importantly, when a disagreement occurs among the institutions or governing boards, THEC has no power to resolve it. This problem of disagreement was addressed specifically by Dr. Elias Blake, witness for the United States. Dr. Blake testified that the first and major problem with the exclusive program allocation approach is the problem of governance. Without a strong central authority, each side must agree. When deciding on programs for de-

segregation, the issue becomes what types of programs are most attractive to both races. Because no institution "worth its salt" wants to give up those types of programs, disagreements invariably result. Thus, the lack of power on the part of THEC is a weakness which leaves in doubt further progress in Nashville.

In the foregoing discussion, the Court has found that the defendants' approach to eliminating the effects of State-imposed segregation in the Nashville area institutions has not worked and that it offers no real hope for further progress in that direction. Therefore, the Court finds that "more radical remedies are required." *Geier v. Dunn, supra,* at 581.

■ The only approach proposed by the parties plaintiff is the merger of TSU and UT–N. The defendant THEC addressed this possibility in its report filed July 31, 1972, which stated: "[A] merger of Tennessee State and U.T. Nashville does not appear to be feasible *at the present time [1972], although this may be necessary at some time in the future to complete the desegregation process and to eliminate duplication and overlapping of programs.*" [Emphasis supplied.] (THEC Report, July 31, 1972, p. 7.) Although rejecting merger for the moment, THEC recognized in its report that UT–N was engaged in competition with TSU for white students, which competition this Court has previously found to exist. THEC's proposals at that time were basically the same as those in the Long Range Plan. Since joint, cooperative and exclusive programming has not resulted in progress toward eliminating the dual system in Nashville, while Tennessee's predominantly white institutions on a statewide basis are making genuine progress towards that end, the Court finds at this time that the only reasonable alternative is the merger of TSU and UT–N into a single institution under a single governing board.

Expert testimony in the record, including some testimony by the defendants' own experts, shows that merger is the best long range solution for desegregating the Nash-

ville area. Dr. Prince A. Jackson,[34] one of four consultants employed by the defendants, testified as follows:

"The consultant group, as we drew up the plan, we talked about merging the two schools and we looked at the advantages and the disadvantages of merging. And I suppose every consultant in the group had his own personal reasons as to why he didn't think that a merger at this time would work, even though down to the last one of us we felt that eventually somewhere in the future, and maybe over the next two or three decades, that the situation would get to the point where you would have one institution in Nashville." (Deposition of Prince A. Jackson, p. 89.)

Dr. Robert W. French,[35] another of defendants' consultants, gave some compelling educational and economic reasons for merging UT–N and TSU. Dr. French stated that the principal reasons for merger include:

"(a) Focus it will place on providing public higher educational opportunities to the Nashville area in a completely coordinated, comprehensive fashion.

"(b) Enlarged opportunities for interinstitutional cooperation.

"(c) Economy.

"(d) Educational efficiency.

"(e) Greater likelihood of developing a truly urban university in metropolitan Nashville."

(Deposition of Dr. Robert French, Exhibit No. 11 thereto.)[36]

The defendants' remaining two consultants also indicated a merger of TSU and UT–N

might be necessary for desegregating the Nashville area. Dr. James Godard[37] stated that he did not think a merger *at this time* was the best answer, because he believed that the approach of joint, cooperative and exclusive programs should be given a serious try. (Deposition of Dr. James Godard, p. 109.) Dr. Anne Pruitt[38] stated that merger was a reasonable alternative; however, she also believed that if there were such a merger that steps should be taken to ensure that the merger did not bring about a decrease in black faculty and administrators or the number of black students enrolling in Tennessee's higher education institutions. (Deposition of Dr. Anne Pruitt, pp. 47–53.)

Expert testimony submitted by the plaintiff-intervenors, Raymond Richardson, *et al.*, also reveals that the merger of UT–N and TSU is the best long range solution to the Nashville area problem. Dr. Albert H. Berrian[39] testified that he believed that the gradual merger of UT–N and TSU into a single institution would be the best long range solution to the Nashville problem. Dr. Berrian testified that the merger should take place over a period of years with UT–N supporting TSU and TSU gradually taking over the programs offered at UT–N. It is noteworthy that Dr. Berrian believed that the fact that UT–N and TSU were governed by different boards was a "built-in conflict" with respect to the desegregation of the Nashville area. (Affidavit of Dr. Albert H. Berrian, filed August 30, 1976; testimony of Dr. Berrian.)

Lastly, the three consultants employed by the United States[40] stated that the most

**34.** President of Savannah State College, Savannah, Georgia.

**35.** Assistant to the President of the University of Alabama, Birmingham Campus.

**36.** Dr. French also stated that "certain difficulties" would accompany such a merger, such as: (a) Loss of two prestigious and meaningful names, (b) probable reduction in public image, (c) rearrangements in governance; and (d) some educational dislocations.

**37.** Dr. Godard is a Special Consultant to the Institute for Higher Educational Opportunity of

the Southern Regional Education Board, in Atlanta, Georgia.

**38.** Dr. Pruitt is a professor in the Department of Education, Case Western Reserve University, Cleveland, Ohio.

**39.** Dr. Berrian is Vice-President of the Institute for Services to Education, Washington, D. C.

**40.** Dr. Steven J. Wright, Vice-President of the College Entrance Examination Board; Dr. Joseph Cosand, Professor of Higher Education and Director of the Center for the Study of Higher Education at the University of Michi-

promising approach for desegregating the Nashville area would be to merge TSU and UT–N into one institution over a period of several years, with TSU as the surviving institution. The United States' consultants have also recommended that as a part of the merger steps should be taken to remedy the vestiges of past discriminatory actions by strengthening TSU to the point that it will have adequate programs, facilities and funding to properly service the Nashville area. (Testimony of Dr. Elias Blake, Jr.; deposition of Dr. Blake, pp. 5, 10–34, 96–101; depositions of Dr. Joseph Cosand, pp. 10–12, and Dr. Stephen J. Wright, pp. 98–107, 110–114.)

The record also shows that several of the defendant officials believe that at some point it will be necessary to merge TSU and UT–N into a single institution. At the recent hearing Dr. Wayne Brown, Executive Director, Tennessee Higher Education Commission, and Mr. Walter Armstrong, past Chairman, Tennessee Higher Education Commission, both testified that the merger of TSU and UT–N will arise through a natural evolution, although they disagreed on the amount of time it would take to reach a merger.[41]

The record further shows that the Ad Hoc Committee, which developed the Long Range Plan, considered the merger of UT–N and TSU, but the Committee's members were unable to agree under which governing board the new institution should be placed. The Committee members therefore arrived at the "compromise" of continuing the existence of both UT–N and TSU and utilizing joint and cooperative programs as the "approach" for desegregating the Nashville area, which plan was the strongest plan that the three boards could agree upon. (Deposition of Johnella H. Martin, pp. 16–17.)

The record shows that the defendants have given three chief reasons for not merging TSU and UT–N: (1) that the approach of joint, cooperative and exclusive programs should be tried; (2) that merger will create disruption in the higher education process; (3) that white flight to other institutions will result if merger under TSU is effected. (Long Range Plan, Introduction, Defendants' Exhibit No. 10; testimony of Mr. Walter Armstrong and Dr. Wayne Brown; deposition of Dr. Brown, p. 13; deposition of Mr. Armstrong, p. 35.) With respect to the first reason, the record clearly shows that the approach of joint, cooperative and exclusive programs heretofore utilized by the defendants has not worked and shows no promise of working. The second reason appears to be speculation on the part of certain defendant officials, as there is no evidence in the record to show that the merger of TSU and UT–N over a period of time would bring about any "disruption." Similarly, the third reason appears to be speculation on the part of several witnesses for the defendants, since none of the witnesses came forth with any evidence from mergers similar to the proposed one. Indeed, most of the witnesses did not know of a merger of one institution into another, except for Dr. Blake who testified to an absorption of one institution by another in Washington, D. C.

In summary, when the record is considered regarding alternative approaches of desegregating the Nashville area, two things become apparent. First, the expert witnesses all believe that merger is an acceptable approach for desegregating the Nashville area, with most of the expert witnesses believing that merger is the best long range solution. Second, most of the expert witnesses and several of the defendant officials believe that eventually there will be one institution in Nashville. Consequently, the evidence overwhelmingly supports merging the two Nashville institutions under one governing board.

---

gan, Ann Arbor, Michigan; Dr. Elias Blake, Jr., President of the Institute for Services to Education, Washington, D. C.

**41.** Dr. Brown qualified his position by stating that he foresaw such a high degree of cooperation that the issue of merger would become moot.

As to which governing board should operate the merged institution, the record contains little testimony in support of merger under UT–N. Neither the record nor the historical facts would support placing the merged institution under the UT Board of Trustees. TSU is a land-grant university with a 60-year history. UT–N is a newly created branch of the UT system which has become a degree-granting campus during the period of this litigation. For the Board of Trustees of UT to take over the merged institution would mean the elimination of TSU as an educational institution with all the concomitant losses entailed therein.

The Court is further of the opinion that merger under the Board of Regents should provide additional advantages with respect to the goal of desegregation since the other three State institutions of higher education in Middle Tennessee are under this Board. Any problems of competition or duplicative programs can obviously best be handled by one governing board.

The Court rejects the proposal of plaintiff-intervenors Richardson, et al., that immediate merger should be directed, feeling that such precipitate action might well result in needless disruption and possibly the temporary loss of some educational services to the Nashville area.

The Court finds that merger under the Board of Regents, with UT–N supporting TSU during the transition period, as suggested by the witness Dr. Albert H. Berrian, offers the best prospect for success. It further finds that the merger should be completed within three (3) years from July 1, 1977.

Although this Court finds that merger is the best solution to the Nashville area problem, the remedy of merger is admittedly a radical remedy. In light of recent Supreme Court decisions limiting federal remedial powers in desegregation cases, the Court finds it necessary to briefly comment on merger in the context of one of these opinions.

In *Austin Independent School District v. United States*, —— U.S. ——, 97 S.Ct. 517, 50 L.Ed.2d 603 (1976), the Supreme Court reversed the Fifth Circuit Court of Appeals approval of a requirement of extensive cross-town busing to achieve a certain degree of racial balance in every school.[42] In reversing, the Supreme Court determined that the Court had abused its remedial powers, which may only be used in the face of a constitutional violation and which, if used, may not exceed the effect of the constitutional violation. In the initial stages of this case, the first criterion was met: the establishment by State statute of a dual system of higher education was a blatant constitutional violation. The second criterion has also been met: merger does not exceed what is necessary to eliminate the effect of the statutory scheme. Eight years under the State's method is proof that a stronger remedy is required. Certainly, it cannot be argued that TSU would be overwhelmingly black today if it had not been established as an institution for negroes. Merger is a drastic remedy, but the State's actions have been egregious examples of constitutional violations.

### SUMMARY OF CONCLUSIONS

Nashville is a metropolitan center with a demonstrated need for a State institution of higher education offering a broad curriculum to both day and evening students. It now has two State universities which have in the past, are now, and will under the State's Long Range Plan, compete for students. This competition has lessened, to some extent, as a result of Court orders in this case, but it can be expected to increase if TSU follows the Plan and increases its evening offerings.

Desegregation at TSU, except for faculty, has been minimal and, to the extent that statistics indicate otherwise, due almost exclusively to the allocation of graduate education courses to it by order of the Court.

Prospects for effective cooperation between the Board of Trustees of the Univer-

---

**42.** This Court is not ordering, nor has it ordered previously, the attainment of a specific percentage of blacks or whites at any institution.

sity of Tennessee and the State Board of Regents, insofar as it may affect the Nashville scene, are very poor. The political prowess of the University, so frequently evidenced in the past, serves to bolster its apparent resolve to offer only minimal cooperation in the efforts necessary to achieve the system of higher education in the Nashville area.

There is no reason why one university in the Nashville area could not effectively utilize both the home.campus of TSU and the downtown campus now occupied by UT–N. The record shows that both are now operating some so-called off-campus centers, and witnesses supporting the Long Range Plan advocated an increase of this activity by TSU.

The two universities in Nashville, TSU and UT–N, must, in order to remedy the constitutional violations discussed herein, be merged under the governance of the State Board of Regents.

Progress by the defendants in the dismantling of a dual system of higher education in Tennessee, outside the Nashville area, has been slow, but the Court does not find that it has been so slow and devoid of good-faith effort as to show that it constitutes, at this time, a violation of constitutional requirements. The Long Range Plan, as it applies to such matters, appears to be a promising step forward and, under the careful supervision of the Monitoring Committee, should result in further progress.

■ The Court recognizes that the representation of blacks in the higher administrative positions in the State system and on the governing boards is minimal and should be increased. It rejects, however, the proposal that the Court should arbitrarily order the appointments of blacks to either the administrative positions or the governing boards, feeling that such action would be an improper exercise of the judicial function.

This opinion constitutes the findings of fact and conclusions of law required by Rule 52, Federal Rules of Civil Procedure.

An appropriate judgment will be submitted by counsel to the Court within twenty.(20) days after the filing of this opinion. Such judgment will, of course, include the time limit of July 1, 1980, for the completion of all facets of the merger approved herein and will provide for retention of jurisdiction by the Court. In the event counsel cannot agree on a form of judgment, separate judgments may be submitted to the Court for consideration.

## JUDGMENT

### FRANK, GRAY, Jr., Chief Judge.

The court issued a memorandum opinion in this action on January 31, 1977, pursuant to its consideration of the entire record herein including the evidence adduced during the month-long evidentiary hearing (September 20 to October 20, 1976) and the proposed findings of fact, or statement in lieu thereof, submitted by the parties. The opinion of January 31, 1977, constitutes the findings of fact and conclusions of law required by Rule 52, Federal Rules of Civil Procedure, and is incorporated herein by reference. Based on these findings of fact and conclusions of law and the entire record, the court ADJUDGES, ORDERS and DECREES as follows:

A. The University of Tennessee-Nashville (UT–N) and Tennessee State University (TSU) shall be merged as a single institution under the governance of the State Board of Regents, such merger to be completed by July 1, 1980. The State Board of Regents will formulate a plan for the merger and its implementation and, in the development of such plan, shall have the assistance of an advisory committee consisting of six persons, three to be named by the President of TSU and three by the Chancellor of UT–N. In addition, all defendants herein are directed to provide necessary assistance to the Board of Regents in the planning and implementation of the merger. The plan for merger will be formulated and filed within seventy-five (75) days after the entry of this Judgment.

B. The Monitoring Committee set up under the Long Range Plan of defendants

will oversee the continued desegregation of the predominantly white institutions of higher education, calling to task any institution which does not make steady progress.

C. Jurisdiction of this case is retained by the court for the enforcement of this Judgment.