597 F.2d 1056
 Rita Sanders GEIER et al., Plaintiffs-Appellees,
United States of America, Intervening Plaintiff-Appellee,
Raymond Richardson, Jr., et al., Intervening Plaintiffs-Appellees,
v.
UNIVERSITY OF TENNESSEE et al., Defendants-Appellants,
Tennessee Higher Education Commission, Defendant-Appellant,
State Board of Regents, Defendant-Appellee.
 Nos. 77-1621, 77-1623 and 77-1625.
 United States Court of Appeals,
Sixth Circuit.
 Argued Oct. 18, 1978.
Decided April 13, 1979.
 
 Thomas W. Steele, Gullett, Steele, Sanford & Robinson, Nashville, Tenn., for defendants-appellants in Nos. 77-1621 and 77-1625.
 George E. Barrett, Barrett, Lenahan, Kniffen & Ray, Nashville, Tenn., for Geier.
 Brian K. Landsberg, Robert J. Reinstein, Dept. of Justice, Washington, D. C., for the United States.
 D. Bruce Shine, Ferguson & Shine, Kingsport, Tenn., Joseph O. Fuller, Fuller & Tunnell, Kingsport, Tenn., for State Board of Regents.
 Avon N. Williams, Jr., Nashville, Tenn., Jack Greenberg, New York City, for Richardson.
 Alfred H. Knight, III, Willis & Knight, Nashville, Tenn., for defendants-appellants in No. 77-1623.
 Before LIVELY and ENGEL, Circuit Judges, and PECK, Senior Circuit Judge.
 LIVELY, Circuit Judge.
 
 
 1
 The issues in this appeal relate to court-ordered desegregation of public institutions of higher education in Tennessee. The appellants are the University of Tennessee, its president and board of trustees (hereafter referred to collectively as UT Board) and the Tennessee Higher Education Commission (hereafter THEC), all defendants below. The appellees are the original plaintiffs, Rita Sanders Geier et al., the United States of America and Raymond Richardson, Jr. et al., intervening plaintiffs, and the State Board of Regents (hereafter SBR), a defendant below. This appeal is primarily concerned with orders of the district court directing that two public institutions of higher education in Nashville, University of Tennessee at Nashville, (UT-N) and Tennessee State University (TSU) be merged into a single institution by July 1, 1980, under the governing authority of SBR.
 
 HISTORICAL BACKGROUND
 
 2
 Historically public higher education in Tennessee was segregated by law. The University of Tennessee was chartered in 1807 and was operated exclusively for white students from at least 1870 until 1960.[1] TSU was founded in 1912 for the express purpose of educating black students. It was the only public institution of higher education in Tennessee which accepted black students prior to 1960. Over a period of years a number of regional state colleges and universities were established, all for the education of white students. In 1947 the University of Tennessee established a "center" at Nashville for the purpose of providing evening instruction for part-time students who worked in state government, business and industry in Nashville. As part of the University of Tennessee system, it was established as an all-white institution. At the time this suit was filed UT-N was a two-year extension college which granted no degrees and taught no advanced courses. At that time TSU remained virtually all black. UT-N is located in downtown Nashville less than five miles from the campus of TSU.
 
 
 3
 Control of the public institutions of higher education in Tennessee has not been under a single governing body in the recent past. The University of Tennessee has always been governed by its own board. For many years TSU was governed by the State Board of Education. In 1972 the Tennessee Legislature created the State Board of Regents which is the governing authority for regional colleges and universities and the community colleges of Tennessee. Governance of TSU was transferred from the State Board of Education to the Board of Regents. TSU differs from all of the other institutions governed by SBR in that it is a land grant college. Further, all of the institutions under the Board of Regents except TSU and Memphis State are regional colleges or universities. TSU has traditionally drawn students from throughout the State and from outside Tennessee.
 
 
 4
 In 1967 the Legislature created the Tennessee Higher Education Commission. Although THEC has some authority over all public institutions of higher learning in Tennessee, insofar as this record is concerned, there is no evidence that prior to being made a party to this suit it ever used its authority in any way to facilitate desegregation in these institutions.
 
 PROCEEDINGS IN THE DISTRICT COURT
 
 5
 This litigation began in 1968 when the appellee Geier (nee Sanders) sought an injunction to prohibit the contemplated expansion of UT-N, to prevent the maintenance of unequal facilities at TSU and white institutions of higher learning and to prevent the maintenance of segregated institutions by action or inaction of the defendants. In addition to the parties to this appeal, the governor of Tennessee and various state officials were named defendants. The claims for relief were based on the assertion that it was unlawful for Tennessee to continue to operate a dual system of public higher education and that the proposed expansion of UT-N would solidify and perpetuate segregation in the public colleges and universities of Tennessee. The intervening complaint of the United States sought much broader relief. Asserting that the maintenance of one black university and a number of white universities by the State of Tennessee violated the Equal Protection Clause of the Fourteenth Amendment and that students at TSU received inferior educational opportunities, the intervenor sought a court order requiring the State to dismantle the dual system and equalize educational opportunities at all public institutions of higher education throughout the State. The United States specifically sought an order that the defendants be required to submit a plan of desegregation and that expansion of UT-N be enjoined.
 
 
 6
 The defendants admitted in their answers that segregation had not been eliminated in the public institutions of higher education in Tennessee, but alleged that progress was being made. They specifically denied that the proposed expansion of UT-N would strengthen or perpetuate segregation.
 
 A. The 1969 Order and Opinion
 
 7
 Following a hearing the district court issued an order on August 22, 1968 denying an injunction to prohibit expansion of UT-N and directing the defendants to prepare and submit to the court a plan for effective desegregation of public higher education in Tennessee. On August 23, 1968 the district court filed an opinion which is reported as Sanders v. Ellington, 288 F.Supp. 937 (M.D.Tenn.1968). Describing the history of public educational opportunities for Negroes in Tennessee as "not a pretty one," the court found that racial requirements for admission to Tennessee's public colleges and universities had been formally abolished and that all were operating under an "open-door policy." However, the court further found that "the dual system of education created originally by law has not been effectively dismantled." Id. at 940. In denying an injunction against expansion of UT-N the district court specifically found that there was nothing in the record to indicate that the University of Tennessee had any intention of making its Nashville center a degree-granting day institution. On this basis the court found that the proposed expansion of UT-N would not necessarily perpetuate a dual system of public higher education.
 
 
 8
 One of the primary arguments of the state defendants before the district court was that they had discharged their constitutional duty to desegregate higher education in Tennessee by removing all racial requirements for admission to the various institutions and adopting an "open-door" admissions policy. This argument relied primarily on the opinion of Chief Judge Frank M. Johnson, Jr. in the three-judge case of Alabama State Teachers Association v. Alabama Public School and College Authority (hereafter referred to as ASTA, 289 F.Supp. 784 (M.D.Ala.1968), Aff'd per curiam, 393 U.S. 400, 89 S.Ct. 681, 21 L.Ed.2d 631 (1969). In ASTA the court declined to enjoin construction of a four-year, degree-granting extension of Auburn University in Montgomery where the state operated the all-black Alabama State College. In ASTA the court noted the fundamental differences between compulsory free education at elementary and secondary levels and higher education which is elective and requires payments by students, and held that the "basic requirement" of the affirmative duty to dismantle a dual system of higher education is met when good faith is exercised in dealing with admissions, faculty and staff. 289 F.Supp. at 789-90.
 
 
 9
 In his opinion Judge Gray stated specifically that he was not basing his denial of an injunction against expansion of UT-N on the holding in ASTA. Citing holdings of the Supreme Court of the United States, particularly Green v. County School Board, 391 U.S. 430, 88 S.Ct. 168, 20 L.Ed.2d 716 (1968), Judge Gray found that the open admissions policy which the State of Tennessee had instituted did not discharge the affirmative duty imposed by the Fourteenth Amendment to dismantle a dual system of higher education in a situation where that policy had produced "no genuine progress toward desegregation and no genuine prospect of progress." 288 F.Supp. at 942. The court then ordered the state defendants to submit a plan "designed to effect such desegregation of the higher educational institutions of Tennessee, with particular attention to Tennessee A & I State University (the former name of TSU) as to indicate the dismantling of the dual system now existing." Id. The district court found it clear from the record "that the failure to make A & I a viable, desegregated institution in the near future is going to lead to its continued deterioration as an institution of higher learning." Id. at 943.
 
 
 10
 In obedience to the court's order the state defendants filed a plan on April 1, 1969 which was little more than a recommendation for a series of actions, described in very general terms. This plan treated the identifiably white institutions and TSU separately. It proposed that the white schools attempt to increase the black presence on their campuses by recruiting at identifiably black high schools, setting aside "certain amounts" for aid to black students and establishing programs which encouraged participation of black people on their campuses. Increased recruitment of black faculty members was also recommended. It was suggested that TSU seek white high school students with an integrated recruiting team, that it institute programs for high school pupils of both races and recruit white faculty members, and that it improve its campus and develop programs which would appeal to students of both races.
 
 
 11
 The plan also proposed that there be joint academic programs between TSU and UT-N, including joint course planning and faculty appointments, easy access and transfer of credits and joint degree programs. After consideration, the district court entered an order in which it neither approved nor disapproved the plan because it lacked specificity. The court directed that the defendants report on each recommendation in the plan, showing development of more specific plans in the various areas and disclosing what progress was being made.
 
 B. The 1972 Opinion
 
 12
 After receiving several reports the district court concluded that, while the state defendants were proceeding at a constitutionally permissible rate of speed in dismantling the dual system on a statewide basis, the 1969 plan was not effectively dealing with the Nashville problem. The memorandum opinion of the court is published as Geier v. Dunn, 337 F.Supp. 573 (M.D.Tenn.1972). Finding few changes at TSU the court specifically held that a dual system of higher education which originated in the state law requiring separation of the races is not dismantled as long as one overwhelmingly black state institution remains surrounded by predominantly white state institutions. Judge Gray concluded that the reports which he had received indicated that the approach to the problem advocated in the original state plan was not working and showed no prospect of working. He therefore ordered that a new plan be formulated which would specifically involve allocation of programs to TSU which would guarantee a substantial "white presence" at that institution and would desegregate its faculty. The defendants were also directed to explore and report on the feasibility of merger of TSU and UT-N among other possibilities. Id. at 581.
 
 
 13
 In the course of his opinion Judge Gray discussed ASTA and the later opinion of a three-judge court in Norris v. State Council of Higher Education for Virginia (hereafter Norris ), 327 F.Supp. 1368 (E.D.Va.), Aff'd per curiam sub nom. Board of Visitors of the College of William & Mary in Virginia v. Norris, 404 U.S. 907, 92 S.Ct. 227, 30 L.Ed.2d 180 (1971). In Norris the district court enjoined the "escalation" of predominantly white Richard Bland College in the same community where traditionally black Virginia State College had been operated since 1882. Although the Norris court sought to distinguish ASTA, its basic holding was that the duty of a state to dismantle a dual system of higher education resulting from previous requirements for separation of the races is the same as the duty to dismantle a dual system of public elementary and secondary education. As Judge Butzner wrote in Norris, the means of eliminating discrimination are necessarily different when dealing with different levels of education, but "the state's duty is as exacting" in one as in the other. 327 F.Supp. at 1373. In analyzing ASTA and Norris Judge Gray found both to be consistent with teachings of Swann v. Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), that the scope of an equity court's power is broad and flexible once a violation of the Constitution has been found and that the court must engage in a balancing of the interests of individuals and those of society, with the nature of the violation determining the scope of the remedy. Applying these principles the district court in the present case recognized the significant interests of the State in setting its educational policies and concluded that Tennessee had met the Basic requirement of the Constitution in establishing open admissions accompanied by good faith recruiting efforts. However, the court specifically found that the adoption of this basic requirement had not resulted in significant changes at TSU and that something further was required.
 
 C. Proceedings Following 1972 Opinion
 
 14
 The defendants then filed a plan with separate proposals for desegregating the faculty and student body at TSU. This plan called for appointment of white faculty members to fill vacancies at TSU unless there was a superior black applicant, the addition of ten non-black new faculty members at TSU to teach in areas of particular interest to white students and a faculty exchange program. The plan also proposed an increase in student aid and that a portion of it be earmarked for the recruitment of white students. In addition other efforts aimed at the recruitment of white students were proposed in general terms. Specifically, the plan called for improvement of the TSU campus, including construction of a new library and business building. The plan also provided for the transfer of a social work program to TSU physically, but did not remove it from the academic structure of UT-N. The court ordered that this plan be implemented immediately as satisfaction of the "initial minimum duty" of the defendants.
 
 
 15
 Thereafter the district court received several reports, none of which indicated any significant success in Nashville. Though UT-N was attracting more black students than previously, there was little improvement in the number of white students studying on campus at TSU. The UT Board and THEC tended to blame this situation on alleged inferiority of TSU and they suggested a task force to recommend improvements at that institution. TSU disagreed with much of what was contained in these reports, contending that UT-N offered direct competition for white students in the Nashville area who were most likely to provide future growth for TSU. The THEC report of July 15, 1972 concluded that the merger of TSU and UT-N was not feasible at that time, but acknowledged that merger might be required in the future. TSU filed a response to the plan put forward by the state defendants in which it strongly urged merger as the only feasible means of dismantling the dual system and specifically requested that TSU be given exclusive control of all public higher education in metropolitan Nashville. It was proposed that UT-N would eventually become the evening center of TSU.
 
 
 16
 On February 23, 1973 the district court granted leave to the plaintiffs Richardson et al. to intervene. The complaint of the intervening plaintiffs addressed the issues somewhat differently than the complaints of both the original plaintiffs and the United States. It sought an injunction barring discrimination against black students, faculty and staff in the adoption and implementation of a desegregation plan, criticized the current plan for requiring an increase in white faculty at TSU without a concomitant increase in black faculty members in the University of Tennessee system and for increasing aid to white students attending TSU without taking steps to increase access of black students to higher education generally. The intervening complaint expressed a concern that plans formulated by the defendants would result in a decrease in the influence and strength of TSU without providing increased opportunities to black students for higher education at the previously all-white institutions. It particularly opposed any plan which would result in TSU being placed under the control of "white persons who are antagonistic to black aspirations." The complaint sought an order directing the adoption and implementation of a plan which would effectively dismantle the dual system of public higher education.
 
 
 17
 A report filed by the defendants on February 14, 1974 showed, steady, if slow, progress in increasing the enrollment of black students and the employment of black faculty members at the formerly all-white institutions throughout the state. Though some desegregation of the faculty and student body at TSU was reported, the court found that progress toward dismantling the dual system in Nashville had been minimal under the 1969 plan and the defendants were ordered to produce a new interim plan. Meanwhile the court did order exclusive allocation to TSU of graduate studies in education in an effort to determine the effectiveness of such an approach. On July 5, 1974 the court entered an order generally approving an interim plan produced by THEC. On July 31, 1974 both the UT Board defendants and the intervening plaintiffs Richardson et al. filed proposed plans. The intervening plaintiffs proposed merger of UT-N into TSU. Their plan also required the appointment of black administrators at executive levels throughout the higher education system of Tennessee and set much higher goals for employment of black faculty members at various institutions than were set in any of the other proposals. The proposal of the defendants which they denominated a "Long Range Plan" set forth goals and implementation procedures for additional desegregation of the various institutions. This plan was jointly developed by the UT Board, THEC and SBR.
 
 
 18
 The United States filed a detailed response and objections to the long range plan in which it took the position that the plan offered no prospect for achieving meaningful desegregation in Nashville. The United States urged the court to adopt a program requiring merger of UT-N into TSU by phasing out UT-N and transferring all programs to TSU as the most promising method of achieving desegregation in the Nashville area. Eventually the downtown facilities of UT-N would be used as a branch of TSU for training state and local government employees. The United States approved the concept of a monitoring committee as proposed in the defendants' long range plan. At about the time the United States filed its response and objections the original plaintiffs filed a statement urging that the only meaningful way to deal with the Nashville situation would be through merger of TSU and UT-N, with TSU as the surviving institution.
 
 
 19
 Thereafter, on May 20, 1975 and February 15, 1976 reports were made on implementation of the long range desegregation plan. The progress report of February 15, 1976 was prepared at the request of the monitoring committee and was filed by it with the court on May 13, 1976. The February 15, 1976 report disclosed increases in black enrollment state-wide, including TSU, from 11.9 to 12.6 per cent from 1974 to 1975 and an increase in the white enrollment at TSU from 10 to 12.2 per cent in the same period. Little progress was reported in the desegregation of faculty and administrators in the Nashville area and details were given of cooperative and joint educational programs which were being undertaken at UT-N and TSU. On the basis of this latest report the defendants filed a motion for summary judgment, arguing that the duty to dismantle the dual system of public higher education in Tennessee had been fulfilled. The court noted several "instances of little or no progress" and denied the motion for summary judgment. Instead, the case was set for trial. Evidence was heard over a period of approximately one month involving 20 trial days.
 
 
 20
 D. The Judgment Appealed from and the 1977 Opinion
 
 
 21
 Following the hearing the district court entered a judgment directing that merger of UT-N and TSU be completed within three years from July 1, 1977. In his opinion accompanying this judgment, reported as Geier v. Blanton, 427 F.Supp. 644 (M.D.Tenn.1977), Judge Gray reviewed in detail the history of the litigation. He noted the failure of the institutions to reach agreement on joint and cooperative program allocation and found that the only significant results had been achieved in the area of graduate studies in education which the court had directed be allocated exclusively to TSU. No cooperative programs had been attempted at that time and the exclusive programs which were assigned on the basis of time of day taught (daytime at TSU and after 4:00 p. m. at UT-N) remained overwhelmingly or predominantly reflective of the racial makeup of the campus where they were taught. The court found that the joint degree program in general engineering was an admitted failure and the prospects were poor for success of a joint masters program in public administration. The court also remarked on the fact that a significant part of the increase in white enrollment at TSU was in off-campus programs and that actual white enrollment on the campus at TSU was only 7 per cent.
 
 
 22
 In assessing the hope for future improvements in the Nashville area under the long range plan as "dim," the court cited the inability of the governing boards to agree on the proper course of action and the reluctance of the "politically powerful" University of Tennessee to take significant steps to eradicate dualism. 427 F.Supp. at 656. The court then concluded "at this time the only reasonable alternative is the merger of TSU and UT-N into a single institution under a single governing board." Id. at 657. The court also determined that the merged institutions should be governed by SBR since TSU would be eliminated if put under the University of Tennessee Board. The court noted further that SBR has control of other institutions in the middle Tennessee area and will be in the best position to control future competition among them.
 
 
 23
 With respect to the situation outside the Nashville area the district court found continuing steady progress in desegregating formerly all-white institutions, although it noted the difficulties being experienced in recruiting black faculty members and administrators. The court approved the long range plan insofar as it relates to schools outside the Nashville area and found that it was not necessary to evaluate all of the specific goals set forth in the plan.
 
 
 24
 In addition to ordering merger the judgment provided for establishment of an advisory committee consisting of three persons representing each of the merged institutions to assist in the preparation and implementation of a plan of merger which was ordered filed within 75 days. The judgment also continued the monitoring committee under the long range plan of the defendants to oversee the continued desegregation of institutions outside Nashville. The court specifically found that there was no constitutional violation at that time in the system statewide, considering the slow but steady progress being made in desegregating the various institutions and the fact that the long range plan appeared to promise further progress. The court admonished that implementation of the long range plan should be under the careful supervision of the monitoring committee.
 
 
 25
 Notices of appeal were filed by the UT Board and the intervening plaintiffs Richardson et al. THEC filed a notice of appeal from that portion of the judgment which ordered merger of the two institutions in Nashville. Neither the original plaintiffs nor the intervening plaintiff, the United States, appealed. Neither SBR nor the other state defendants (excepting the UT Board and THEC) appealed. The appeal of the plaintiffs-intervenors Richardson et al. is primarily concerned with the long range plan outside the Nashville area and will be dealt with in a separate opinion.
 
 
 26
 E. Post-Judgment Proceedings in the District Court
 
 
 27
 As directed in the judgment SBR filed a plan of merger on May 11, 1977. On June 13, 1977 the intervening plaintiffs Richardson et al. filed detailed objections and the UT Board filed a motion to strike the plan of merger. The intervenor United States filed objections setting forth the "inadequacies of the plan" and stating that it was "a plan for planning merger since it lacked the required specificity to be considered a plan of merger." After first holding that it had no jurisdiction because notices of appeal had been filed, on July 22, 1977 the district court overruled all motions and held that the plan submitted by SBR does not violate the judgment and should be put into effect unless stayed. Both the intervening plaintiffs Richardson et al. and the UT Board filed notices of appeal from this order. Subsequently the district court denied a motion for stay and upon application to this court a stay was also denied.
 
 F. Description of the Plan of Merger
 
 28
 Though it may lack specific details with respect to the exact steps to be taken in each area of implementation and the precise timing of such steps, the SBR plan presents a comprehensive framework for implementation of merger. It provides detailed guidelines and directives in the areas of curriculum and degree requirements, employment rights of faculty and staff of both institutions including grievance procedures, provision for participation in student government by former UT-N students, and guarantees to former UT-N faculty of the right to participate in the faculty senate and standing committees. It also outlines procedures for purchasing and leasing equipment and library materials. The plan defines the role of the expanded TSU in terms of a broad range of programs suitable to an urban university and provides for operation of the expanded TSU 14 hours per day and full utilization of all facilities.
 
 
 29
 The plan provides for an implementation committee made up of members from the SBR, UT Board and THEC, a majority of whom may be black. This committee is to report its activities both to SBR and the monitoring committee each quarter and the chancellor of SBR is to report annually to the district court. A bi-racial advisory committee of ten members is to be appointed by the governor to assist the implementation committee. That committee will work through subcommittees having representatives of the faculty, staff and students of both institutions. The plan provides for nine academic subcommittees, three administrative subcommittees and a subcommittee for student affairs. Detailed timetables are set forth for each of the subcommittees, with all beginning work on July 1, 1977 and full implementation contemplated in July or August 1979. The plan also provides that headquarters of the expanded TSU will be on its present campus and that a vice-president for public service and administration will be the highest officer stationed on the former UT-N downtown campus. A dean for continuing education and evening programs will also maintain an office on the downtown campus, and evening programs are to be continued and expanded as required.
 
 THE CONSTITUTIONAL VIOLATION
 
 30
 A. The Vestiges of State-Imposed Segregation Remained
 
 
 31
 Though they differ somewhat in emphasis, the essential position of both appellants is the same. While conceding that Tennessee operated a state-imposed dual system of public higher education prior to 1960, the UT Board and THEC contend that the State fulfilled its constitutional obligation to establish a unitary system when it instituted an "open-door" admissions policy. They argue that the present predominantly black enrollment at TSU has resulted from the exercise of free choice by students rather than from any Current unconstitutional actions of the State. The mere fact that TSU remains predominantly black, they contend, is not evidence of a violation. Thus since there is no present violation, there is no authority for the district court to impose a remedy. Basic to their argument is the contention that the district court made fatally inconsistent findings in determining that the defendants were acting within constitutional requirements in proceeding to desegregate public higher education statewide, but were acting unconstitutionally in the Nashville area. In support of this claim the appellants point out that both TSU and UT-N had a larger percentage of "other race" students at the time of the 1977 hearing than any of the other public institutions.
 
 
 32
 The UT Board's brief prefaces its argument that the district court applied an impermissible constitutional standard with the following statement: "The District Court apparently concluded that the existence of a predominantly black institution of higher education in a free-choice system, in and of itself, created a dual system of higher education which offended the Constitution." This is not an accurate statement of the district court's holding. It was not the existence of a predominantly black institution In and of itself which the district court held offended the Constitution. It was the failure of the defendants to dismantle a statewide dual system, the "heart" of which was an all-black TSU, which was found to be a continuing constitutional violation. While the district court found in 1968 that the defendants had not been guilty of constitutional violations in the Recent past, it specifically found in the same opinion that "the dual system of education created originally by law ha(d) not been effectively dismantled." 288 F.Supp. at 940. The district court made the same finding in each of its subsequent opinions, and this was the basis of its merger order.
 
 
 33
 B. The Affirmative Duty to Dismantle the Dual System
 
 
 34
 The fundamental disagreement between the district court and the appellants concerns the duty of a state to remove the vestiges of state-imposed segregation. The appellants point to the obvious differences between elementary and secondary education on the one hand and higher education on the other. One is free and compulsory and pupils are assigned to particular schools. The other is purely elective, requires the payment of tuition and fees, and permits students to choose a particular school for a variety of reasons. Most elementary and secondary schools in a given system are roughly equal in curriculum and facilities whereas individual colleges and universities vary greatly in their offerings and emphases. All these factors were discussed fully in ASTA, supra, 289 F.Supp. 784.
 
 
 35
 The district court recognized these differences in the present case. Also, it agreed with the ASTA court that the "basic requirement" of the affirmative duty to dismantle a dual system of higher education was met when an open admissions policy was adopted and good faith was exercised in dealing with admissions, faculty and staff. However, the district court found that something beyond this basic requirement was needed to satisfy the constitutional imperative in the present case where segregation was once required by state law and "egregious" conditions of segregation continued to exist in public higher education in the Nashville area. What was required, the court found, was affirmative action to remove these vestiges. The district court relied principally on Green v. County School Board, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968), where a "freedom-of-choice" plan was held to be an inadequate compliance by a school board with the constitutional requirement that a well-entrenched dual system be dismantled. The Court held in Green that in such a situation a school board is "clearly charged with the affirmative duty to take whatever steps might be necessary to convert to a unitary system in which racial discrimination would be eliminated root and branch." Id. at 437-38, 88 S.Ct. at 1694.
 
 
 36
 The appellants argue that Green and similar decisions apply only to elementary and secondary education, not to public higher education. Green was concerned with whether a violation which continued after a freedom-of-choice plan was initiated required affirmative action. We conclude that the Green requirement of an affirmative duty applies to public higher education as well as to education at the elementary and secondary school levels. We agree with the court in Norris v. State Council, supra, that "the state's duty is as exacting" to eliminate the vestiges of state-imposed segregation in higher education as in elementary and secondary school systems; it is only the means of eliminating segregation which differ. 327 F.Supp. at 1373.[2]
 
 
 37
 The Supreme Court has never dealt with the precise issues in this case. Both ASTA and Norris were decided without opinion, though Mr. Justice Douglas filed a dissent in ASTA. Sixteen years before its decision in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) (Brown I ), the Supreme Court held that it was a denial of equal protection for a state to deny admission to the law school of a state university to a Negro applicant while failing to provide a separate, equal opportunity for legal education within the state. Missouri, ex rel. Gaines v. Canada, 305 U.S. 337, 59 S.Ct. 232, 83 L.Ed. 208 (1938). See also Sipuel v. Board of Regents, 332 U.S. 631, 68 S.Ct. 299, 92 L.Ed. 247 (1948); Sweatt v. Painter, 339 U.S. 629, 70 S.Ct. 848, 94 L.Ed. 1114 (1950); McLaurin v. Oklahoma, 339 U.S. 637, 70 S.Ct. 851, 94 L.Ed. 1149 (1950). The fact that the Supreme Court has not addressed the issue of desegregation in public higher education since abandonment of the "separate but equal" doctrine in Brown I does not persuade us that it would hold that a state which once required separation of the races in public institutions of higher education has no duty to do more than establish an open admissions policy. The teachings of numerous decisions beginning with Brown v. Board of Education, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) (Brown II ), are to the contrary. In Brown II the Court referred to its historic opinion in Brown I as "declaring the fundamental principle that racial discrimination in Public education is unconstitutional . . . ." 349 U.S. at 298, 75 S.Ct. at 755. (emphasis added). The constitutional violation in Brown I consisted of the state's requiring that students be segregated by race; the level of education at which the enforced separation was required was not determinative. No distinction was made between public higher education and public elementary and secondary education, and we can perceive none in defining the constitutional right of equal opportunity.
 
 
 38
 After the court declared in Brown I that enforced separation in education is "inherently unequal," 347 U.S. at 495, 74 S.Ct. 686, the states were given an opportunity to dismantle their dual systems voluntarily. Some proceeded rapidly to accomplish this, Brown II, 349 U.S. at 299, 75 S.Ct. 753, and other violators were directed to proceed to do so "with all deliberate speed." Id. at 301, 75 S.Ct. 753. By the time of Green 13 years had elapsed since the decision in Brown II and the only step taken by the Kent County School Board was the institution of a freedom-of-choice plan. The Court found that this plan was not bringing about an end to segregation and offered no realistic promise of doing so. Under these circumstances the Supreme Court held that there was an affirmative duty to devise and implement a plan that would lead to elimination of all vestiges of the system of state-imposed segregation. There is nothing in the Green opinion which indicates that a different requirement would apply in public higher education.
 
 C. The Failure to Dismantle the Dual System
 
 39
 The facts of the present case are closely analogous to those in Green. Thirteen years after Brown II the only step which the Tennessee defendants had taken toward dismantling the dual system of public higher education was inauguration of an open admissions policy. The evidence was uncontradicted that little progress had been made. Yet the District Judge did not immediately impose a plan on the State, recognizing its strong interest in making educational policy decisions. Instead, he directed the defendants to formulate a plan. Though several plans were put forward in subsequent years none really came to grips with the Nashville situation. There the vestiges of state-imposed segregation were clear and undiminished in reality.
 
 
 40
 The Constitution may be violated by inaction as well as by deeds. Here the district court found evidence of both inaction and wrongful action in assessing conditions in public higher education in the Nashville area. During the course of this litigation UT-N grew from a non-degree-granting "center" of the University of Tennessee to a branch of the University with a four-year degree program. During this period the student body of UT-N grew from 1800 to 3500, of whom 89 per cent were white, while that of TSU remained virtually static. From these facts the district court concluded that the existence and expansion of the predominantly white UT-N alongside the traditionally black TSU "have impeded the dismantling of the dual system." 427 F.Supp. at 652.
 
 
 41
 The appellants dispute this conclusion, pointing to the differences between TSU and UT-N. They emphasize that TSU is a "traditional university" with a broad range of offerings and a student body of traditional college age, most of whom live on campus. On the other hand, UT-N has limited offerings primarily intended for older working students who can attend classes only in the late afternoon and at night. Granting that these distinctions exist, nevertheless the district court had abundant evidence to support its findings. More than one expert witness testified that the most likely source of white students for a traditionally black university in an urban area is older working students. Thus the rapid development of UT-N into a degree-granting four-year branch, even though it continued to be primarily a night school, did impede the progress of desegregation of TSU.[3]
 
 D. Conclusion
 
 42
 We conclude that the district court did not base its finding of a constitutional violation on the mere existence of one identifiably black university in the entire system. As the defendants point out, the Supreme Court held in Swann, supra, the existence of a "small number of one-race, or virtually one-race, schools within a district is not in and of itself the mark of a system that still practices segregation by law." 402 U.S. at 26, 91 S.Ct. at 1281. The district court in the present case did not base its finding on the existence of predominantly black TSU "in and of itself." To the contrary, Judge Gray specifically found that TSU required special attention because it was "the heart of the dual system." Further, he found that TSU continued to be predominantly black long after the open admissions policy was instituted because of a failure by state officials to take meaningful actions to facilitate its desegregation while acting with respect to UT-N in ways which impeded the required dismantling of the dual system. There was no failure to articulate the standard by which the district court determined that a constitutional violation existed in Nashville and no fatal inconsistency in his findings, as contended by the defendants.
 
 
 43
 The findings of the district court on the actions and inactions by the defendants are supported by substantial evidence and are not clearly erroneous. The conclusion that these actions and failures to act constitute a violation of the constitutional duty to dismantle a dual system of public higher education is in accord with pronouncements of the Supreme Court from Brown II to the present time. Where an open admissions policy neither produces the required result of desegregation nor promises realistically to do so, something further is required. Green, supra; Norris, supra; Hunnicutt v. Burge, 356 F.Supp. 1227 (M.D.Ga.1973); Lee v. Macon County Board of Education, 317 F.Supp. 103 (M.D.Ala.1970), Aff'd in part, 453 F.2d 524 (5th Cir. 1971).THE MERGER REMEDY
 
 A. The Propriety of Merger as a Remedy
 
 44
 The appellants argue that the merger remedy was beyond the district court's equitable power and was not an "appropriate" remedy. It is clearly established that a district court is controlled by general principles of equity in fashioning a desegregation remedy. Swann, supra; Brown II, Supra; Milliken v. Bradley, 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977) (Milliken II ). This axiom was discussed by the Court in Milliken II in the following language:
 
 
 45
 Application of those "equitable principles," we have held, requires federal courts to focus upon three factors. In the first place, like other equitable remedies, the nature of the desegregation remedy is to be determined by the nature and scope of the constitutional violation. Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S., at 16 (91 S.Ct. 1267). The remedy must therefore be related to "the Condition alleged to offend the Constitution . . . ." Milliken I, 418 U.S. (717) at 738 (94 S.Ct. 3112, 41 L.Ed.2d 1069). Second, the decree must indeed be Remedial in nature, that is, it must be designed as nearly as possible "to restore the victims of discriminatory conduct to the position they would have occupied in the absence of such conduct." Id., at 746 (94 S.Ct. 3112). Third, the federal courts in devising a remedy must take into account the interests of state and local authorities in managing their own affairs, consistent with the Constitution. In Brown II the Court squarely held that "(s)chool authorities have the Primary responsibility for elucidating, assessing, and solving these problems . . . ." 349 U.S., at 299 (75 S.Ct. 753). (Emphasis supplied.) If, however, "school authorities fail in their affirmative obligations . . . judicial authority may be invoked." Swann, supra, (402 U.S.) at 15 (91 S.Ct. 1267). Once invoked, "the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies." Ibid.
 
 
 46
 433 U.S. at 280-81, 97 S.Ct. at 2757. (Footnotes omitted).
 
 
 47
 Applying these principles we conclude that merger was within the equitable power of the district court. The merger remedy was related to the condition found to offend the Constitution. This "condition" was failure to dismantle a dual system. The core of the problem was found to be the inability of TSU to attract a "white presence" to its campus because of the competition of UT-N for students in the Nashville area. This competition would not have been so formidable if UT-N had remained a non-degree-granting extension center. Its expansion to a four-year degree-granting institution greatly inhibited the efforts to desegregate TSU. Further, the remedy of merger effectually restores the victims of discrimination to their rightful place. The black students had a constitutional right to attend a unitary system of higher education, which was denied them by state action. The merger will permit TSU to expand as a comprehensive urban university, offering educational opportunities to students of traditional college age and older working students in a desegregated setting. The nature of the remedy does not exceed the nature and scope of the violation.
 
 
 48
 The district court stayed its hand for years in order to give the defendants an opportunity to effectuate a meaningful desegregation of TSU. The court initially approved the approach championed by the defendants of instituting joint and cooperative programs while permitting the two institutions to continue their separate existence. After nearly nine years the court found that no progress was being made with this approach and that this failure resulted largely from the inability of the governing boards to agree. The district court clearly took into account the interest of the defendants in managing higher education programs of the State on a statewide basis. However, when the authorities "fail(ed) in their affirmative obligations," Milliken II, supra, 433 U.S. at 281, 97 S.Ct. 2749, the court properly invoked its equitable power.
 
 
 49
 The scope of the district court's equitable power is broad enough to encompass a merger order under the facts of this case. The court's experience taught that the only meaningful results were obtained when it ordered the graduate program in education transferred exclusively to TSU. A merger of the two institutions will involve the district court in their day-to-day affairs to a much less pervasive degree than any attempt by it to divide and allocate all the various programs to one school or the other. Merger also intrudes less into the freedom of students to attend a college of their choice than any plan which might require compulsory assignments to bring about a dismantling of the dual system. The acknowledged differences between higher education and education at the primary and secondary levels appear to make such frequently used remedies as assignment and transportation of students to a particular institution unworkable as well as undesirable.
 
 
 50
 It should also be noted that merger is not unheard of in the Tennessee public higher education system. The record discloses that the University of Tennessee and Memphis State University both conducted night classes in Memphis at one time. The University of Tennessee proposed to change its Memphis extension center to a degree-granting resident center. After negotiations between the two institutions the program at the UT center was phased out and Memphis State began operating a "joint university center." The final effect of these developments was a merger with Memphis State the surviving institution.
 
 
 51
 B. Legality of Inclusion of UT-N in Merger Order
 
 
 52
 The appellants next contend that even if there was a violation the merger ordered by the district court was an improper remedy. The UT Board argues that the merger order is the equivalent of an interdistrict order such as was proscribed by the Supreme Court in Milliken v. Bradley, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974) (Milliken I ). The specific language relied upon is as follows:
 
 
 53
 Before the boundaries of separate and autonomous school districts may be set aside by consolidating the separate units for remedial purposes or by imposing a cross-district remedy, it must first be shown that there has been a constitutional violation within one district that produces a significant segregative effect in another district. Specifically, it must be shown that racially discriminatory acts of the state or local school districts, or of a single school district have been a substantial cause of interdistrict segregation.
 
 
 54
 418 U.S. at 744-45, 94 S.Ct. at 3127.
 
 
 55
 This argument fails for two reasons. First, it does not recognize the underlying reason for avoiding interdistrict remedies the strong public interest in maintaining local control over public schools. Milliken I, supra.[4] Both the UT Board and SBR have state-wide jurisdiction over their respective systems. Neither is the equivalent of a local school board through which a local community exercises control over the education of students living in that community.
 
 
 56
 Even if the two separate governing board within the statewide system of public higher education in Tennessee could be considered equivalent to separate school boards there is another fundamental reason for holding that Milliken I does not forbid involvement of the UT Board in desegregation in the Nashville area. Immediately following the language of the Supreme Court which is quoted above the court stated:
 
 
 57
 Thus an interdistrict remedy might be in order where the racially discriminatory acts of one or more school districts caused racial segregation in an adjacent district, or where district lines have been deliberately drawn on the basis of race. In such circumstances an interdistrict remedy would be appropriate to eliminate the interdistrict segregation directly caused by the constitutional violation. 418 U.S. at 745, 94 S.Ct. at 3127.
 
 
 58
 The district court found that acts of the UT Board in expanding the program and size of UT-N impede desegregation of TSU and thus the dismantling of Tennessee's dual system of public higher education. The appellants argue that this is not a finding of a constitutional violation. However, the court found that the effects of the earlier state-imposed segregation were not being eliminated in the Nashville area, in part at least, because of the expansion of UT-N and the unwillingness or inability of the UT Board to agree to programs which realistically promised to remove the vestiges of the old order. This is a finding that actions of the UT Board perpetuated segregation in the Nashville area and is sufficient to support an "interboard" remedy under Milliken I.
 
 
 59
 Finally, the UT Board contends that it was an "innocent party," pointing out that the district court made no finding that its recent actions were intended to perpetuate segregation. The holdings of the Supreme Court with respect to intent in Washington v. Davis, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), and Keyes v. School Dist. No. 1., 413 U.S. 189,91 S.Ct. 3033, 37 L.Ed.2d 1043 (1973), apply to de facto, not to de jure segregation. NAACP v. Lansing Board of Education, 559 F.2d 1042, 1045 (6th Cir.), Cert. denied, 434 U.S. 997, 98 S.Ct. 635, 54 L.Ed.2d 491 (1977); United States v. Texas Education Agency, 564 F.2d 162, 165 (5th Cir. 1977). The UT Board appears to argue that only SBR practiced de jure segregation since it and its predecessor, State Board of Education, operated all-black TSU as part of the regional system which also included all-white institutions. Since it operated only an all-white university and no black institutions the UT Board contends it was not engaged in de jure segregation. This argument is specious. De jure segregation was maintained throughout Tennessee public higher education prior to 1960 both by the exclusion of Negroes from the University of Tennessee and SBR institutions and the operation of TSU as an all-black university. The duty to dismantle the dual system falls on both boards.
 
 
 60
 The present case is controlled by Newburg Area Council, Inc. v. Board of Education of Jefferson County, Kentucky, 510 F.2d 1358 (6th Cir. 1974), Cert. denied, 421 U.S. 931, 95 S.Ct. 1658, 44 L.Ed.2d 88 (1975). In Newburg we distinguished Milliken I as follows:
 
 
 61
 A vital distinction between Milliken and the present cases is that in the former there was no evidence that the outlying school districts had committed acts of de jure segregation or that they were operating dual school systems. Exactly the opposite is true here since both the Louisville and Jefferson County School Districts have been expressly found by this Court to have failed to eliminate all vestiges of state-imposed segregation. Consequently, as contrasted with the outlying Michigan districts, they are guilty of maintaining dual school systems. 510 F.2d at 1359.
 
 
 62
 We conclude that the district court did not exceed its powers in directing that UT-N be merged with TSU even though the two institutions have been under the control of different statewide boards. The Fourteenth Amendment provides that No state "shall . . . deprive . . . any person within its jurisdiction the equal protection of the laws." It was the State, acting through its legislature, which required for many years that black persons pursuing an education in a public institution of higher education be isolated from white persons engaged in the same endeavor. The colleges and universities under the jurisdiction of the UT Board as well as those under SBR were operated as part of a dual system. Both boards and all the public institutions are instrumentalities of the State. After the doors of all institutions were opened to all qualified applicants without regard to race, the effects of the previous segregation lingered. TSU remained an almost totally black university in student body, faculty and administration. Its efforts to desegregate were directly affected by competition from the expanding UT-N. Since the policies and actions of the UT Board contributed to the perpetuation of the dual system there was no legal reason why it should not be required to participate in the court-ordered plan for dismantling that system.
 
 CONCLUSION
 
 63
 The appellants insist that the district court has failed to consider the vital interests of the State in being able to make educational policy decisions on a statewide basis. They contend that the court has unnecessarily interfered with decisions as to the roles and functions of the various institutions. These arguments are not persuasive. Those policy decisions of the two boards and THEC which failed to take into account the State's constitutional duty to dismantle its dual system must yield to that duty. Though TSU and UT-N were given different roles in the overall scheme of public higher education there was an abundance of expert testimony that they could be combined and that one institution could perform all the functions previously assigned to them separately. Basically the defendants insist upon treating the existence of TSU as an isolated unconstitutional condition rather than the core of a violation which permeated the entire system. The district court never found that the dual system had been dismantled everywhere but at TSU. On the contrary, Judge Gray found that some progress was being made statewide and that if the situation in Nashville were remedied, there would be promise of greater progress throughout the system.
 
 
 64
 We do not deal with various objections to the plan of merger filed after this appeal was taken. With the issuance of this court's mandate this case will again be before the district court for whatever steps are necessary in the implementation of the orders which we affirm. By that time many of the steps contemplated in the plan of merger will have been taken. If any parties continue to feel that the plan is deficient they will have an opportunity to bring their views to the attention of the district court. If further hearings are required with respect to the plan there will be no impediment to the district court's holding hearings while implementation goes forward.
 
 
 65
 We recapitulate our holdings: (1) the district court did not err in holding that the defendants have an affirmative duty to dismantle the dual system of public higher education which heretofore existed in Tennessee; (2) the district court did not err in holding that the open admissions policy instituted in 1960 failed to dismantle the dual system; (3) the district court did not err in holding that the defendants are required to take affirmative steps to complete dismantling the dual system; (4) the district court did not err in finding that the existence of an expanding UT-N in close proximity to TSU has impeded the progress of desegregating TSU and of dismantling the dual system; (5) the district court did not exceed its equitable power or impose an inappropriate remedy in ordering merger of UT-N and TSU under the governing authority of SBR.
 
 
 66
 The judgment of the district court is affirmed on the appeals of the UT Board and THEC. No costs allowed.
 
 
 67
 ENGEL, Circuit Judge, dissenting.
 
 
 68
 I respectfully dissent. In my opinion the ordered remedy of a merger of the University of Tennessee-Nashville (UT-N) and Tennessee State University (TSU) is violative of the principles set forth in Milliken v. Bradley, 418 U.S. 717, 94 S.Ct. 3112, 41 L.Ed.2d 1069 (1974) (Milliken I ), because it goes beyond the constitutional wrong found to have been committed by the University of Tennessee (UT) and, equally important, because it tends to strengthen rather than eliminate segregation in higher education in Tennessee.[1]
 
 
 69
 The controlling truths in this case are readily apparent. Historically the public institutions of higher education in Tennessee were segregated by law.[2] Black students were not admitted to UT and white students were not admitted to TSU. The faculty at UT was white and the faculty at TSU was black. Comparable segregation existed in the administrative staffs.
 
 
 70
 Until this litigation began in 1968, both UT and TSU remained identifiable by race on the levels of faculty, administration and student body. While the district court reports that satisfactory progress has been made throughout the rest of the system, a ruling which we affirm in the companion case of Richardson v. Blanton, 597 F.2d 1078, (6th Cir. 1979), it held, as does the majority opinion here, that the vestiges of the dual system remain in TSU, which continues to have a virtually all black student body and continues to have a heavy majority of blacks on the administrative staff and faculty.
 
 
 71
 The instant litigation has been fairly and accurately summarized by Judge Lively in the majority opinion. As can be seen from that account, this litigation commenced when parties, purporting to represent the interests of blacks and TSU, complained of the proposed expansion of UT's downtown night school in Nashville, which had been established in 1947, to provide instruction for part-time students who worked in state government, business and industry. UT-N was then an extension center offering resident credit, but granting no degrees and teaching no advanced courses. Since Nashville is the capital of the state, it is not surprising that such a school would be established in the center of the city, and at least the initial establishment of the school appears to have been for reasons other than race. Sanders v. Ellington, 288 F.Supp. 937, 941 (M.D.Tenn.1968). It was not competitive with the requirements of a full curriculum university such as TSU. Nevertheless, the potential competition from this center caused the commencement of the present litigation. While the district judge did not enjoin the expansion of the UT-N center, it was apparent that he was properly determined in the ensuing litigation to ascertain the extent to which the fears of TSU might be justified.
 
 
 72
 Substantial evidence supports the district court's and Judge Lively's finding that the expansion of UT-N was in fact competitive with the educational opportunities presented at TSU and I cannot fault the conclusion that the expansion, unless halted, would undoubtedly have seen UT establishing a full four-year university program in Nashville, directly competitive with TSU.[3] It is a reasonable and almost inescapable conclusion that the proposed and actual expansion of UT-N was the result of public pressure to have operating in the Nashville area a local public university, not having the racial identification as a black university which TSU was perceived to possess.
 
 
 73
 Clearly UT's efforts to expand under such circumstances would strongly tend to impede any legitimate effort on the part of TSU to integrate. Since both systems had been a part of a De jure segregated system of higher education in Tennessee, I cannot, therefore, disagree that a duty to refrain from such conduct might be found to rest upon UT.[4] Likewise, I agree that Milliken I, supra, and even more, Wright v. Council of the City of Emporia, 407 U.S. 451, 92 S.Ct. 2196, 33 L.Ed.2d 51 (1972), and United States v. Scotland Neck City Board of Education, 407 U.S. 484, 92 S.Ct. 2214, 33 L.Ed.2d 75 (1972),[5] would not prohibit an appropriate interdistrict or intersystem remedy under such circumstances. The difficulty here, however, is that the remedy is not responsive to the ill.[6]
 
 
 74
 The majority opinion speaks repeatedly in one form or another of the failure of all previous efforts on the part of the parties to "remove the vestiges of state-imposed segregation." Majority opinion at 1065. What it really means is that the state has never succeeded in obtaining racially balanced faculty at TSU, nor either has it persuaded black applicants for admission to TSU to attend other schools which are now open to them, or conversely has it persuaded potential white college students to attend TSU. The reasons for this are somehow all laid at the door of UT, even though the court has found that UT itself has been satisfactorily integrating its faculty, staff and student body, and that in fact, its composition and its racial balance are becoming representative of the racial balance of the state as a whole.[7] Geier v. Dunn, 337 F.Supp. 573, 580 (M.D.Tenn.1972) (with the exception of TSU, the universities in Tennessee are being desegregated at a constitutionally permissible speed). UT-N is being ordered to transfer over its property to a school which is not integrated[8] in the hope that somehow that action will solve the problem. In truth, the problem lies in other factors.
 
 
 75
 In my opinion there is little that the courts, and for that matter the public institutions themselves, should do to discourage attendance at a state institution of higher learning by any applicants because of race. Nevertheless, the exercise of what ought to be a free and personal choice on the part of student applicants is itself treated somehow as the sufferance of a constitutional violation by the institutions involved. As Judge Lively's opinion points out, unlike the other regional schools throughout the state and under the control of the State Board of Regents, TSU continues to draw black students from the entire State of Tennessee. I do not doubt that its attractiveness to black students may very well affect the racial balance of the student bodies of the other colleges throughout the State of Tennessee, but is this a reason for finding fault with it? If a student elsewhere in the state has the right, as he now has in Tennessee, to enroll in a regional college of his choice without impediment because of his race, is it wrong for him to elect to go to a college such as TSU if he prefers? I can hardly believe it. Likewise, if TSU is and remains racially identifiable because of the racial composition of its faculty and staff, are we to compel a white student in a non-compulsory system nonetheless to attend the school which he identifies as black? Obviously, there is much less that courts and institutions should or can in fact do in this area where attendance is voluntary. This fundamental difference between higher education and the compulsory nature of public education at the primary and secondary levels has been consistently recognized. See Lee v. Macon County Board of Education, 453 F.2d 524, 527 (5th Cir. 1971); Alabama State Teachers Association v. Alabama Public School and College Authority, 289 F.Supp. 784, 787-88, 790 (M.D.Ala.1968), Aff'd, 393 U.S. 400, 89 S.Ct. 681, 21 L.Ed.2d 631 (1969) (per curiam). Cf. Florida ex rel. Hawkins v. Board of Control, 350 U.S. 413, 76 S.Ct. 464, 100 L.Ed. 486 (1956); Norris v. State Council of Higher Education, 327 F.Supp. 1368, 1381 (E.D.Va.) (Hoffman, J., dissenting in part), Aff'd sub nom., Board of Visitors of the College of William & Mary v. Norris, 404 U.S. 907, 92 S.Ct. 227, 30 L.Ed.2d 180 (1971).
 
 
 76
 The real difficulty, apparent throughout the entire record in this case, and a difficulty with which I have considerable sympathy, lies in the efforts of TSU to retain its identification as a black university. Unfortunately this factor has had a strongly deterrent effect upon its attractiveness to white applicants. The record makes it altogether evident that much of the concern of TSU has been not only with the competition for students which it faces, but with the fact that it may lose its identity as a respected and long-standing black university.[9] Nevertheless, in a time when opportunities for integrated education are becoming increasingly available, a school which primarily attracts but one race may find it increasingly difficult to prosper.
 
 
 77
 It seems to me that TSU must reach the reluctant conclusion that the Equal Protection Clause no longer will permit the state purposefully to maintain and perpetuate a faculty and staff whose composition is disproportionate to the racial composition of the area which it purports to serve. At the same time, the desegregation of a faculty such as that at TSU is nowhere near as simple a matter as the desegregation of the faculty in a primary and secondary school system in which teachers can be transferred with relative ease from one school to another within the same system and community. That is simply not possible here where TSU constitutes the only member of the State Board of Regents system in the Nashville area.
 
 
 78
 It would be manifestly inequitable to require that black teachers be displaced with white teachers merely to achieve a racial balance. In my judgment, the individual injury which this would occasion outweighs any potential constitutional benefit. So much is recognized, I believe, in the plans for the desegregation of the faculty which are already in effect. It would be enough if the establishment of a racially balanced faculty at TSU were left to the prospective operation of a truly neutral faculty selection system, leaving it to attrition to restore the balance which equal protection may be found to require. Instead, my reading of the majority opinion indicates that the district court approved a program which compels TSU to hire a white teacher in all vacancies which may prospectively exist unless a black applicant is, in fact, superior. Majority opinion at 1061. The Supreme Court of Brown I and Brown II would be amazed to find that its decisions had come to this end.[10] Such a ruling represents not only bad policy, but unjustified and hence unconstitutional discrimination against black applicants of equal talent.
 
 
 79
 It may take somewhat longer to achieve actual racial balance at TSU by a more neutral policy, but in the long run, it is infinitely preferable both in principle and in impact. If left to stand, the district court's plan would result in a faculty whose older members were predominately black and whose younger members were overwhelmingly white. When a nose-count balance was achieved, the retirement or departure of the older faculty would again create a reverse imbalance which would have to be corrected. This simply makes no sense. What the TSU faculty and staff selection mechanism should be learning, and learning now, is how to be neutral, not how to discriminate the other way.
 
 
 80
 If the facilities are adequate, if any discrimination has otherwise been eliminated, and if TSU is making an honest and diligent effort to achieve a modicum of racial balance in its faculty and staff, then I believe that any perceived evil in the racial composition of the student body will cure itself, to the extent this is even needed. There is undoubtedly a need for a four-year public institution of higher learning in Nashville and this is probably one of the needs which generated the pressure to create UT-N. It is a pressure which will remain to persuade students to attend TSU in increasing numbers as that institution, by its own color-blind policies, becomes more attractive to white students and less identifiable as an all black college. By 1975, 12.2% Of the students at TSU were white. White student participation in the student body at TSU can, it seems to me, be expected to grow in direct proportion to the ability and willingness of TSU to shed its former identification as an all black college and to assume a new and enlarged role as an integrated university and as a full part in the system operated by the State Board of Regents.
 
 
 81
 It is somehow suggested that there is no harm in the proposal by the district court to transfer UT-N to TSU, and as authority for that there is cited a comparable voluntary effort in Memphis wherein UT relinquished to the Memphis State University its control over a night school operated by UT. See Geier v. Blanton, 427 F.Supp. 644, 653 (M.D.Tenn.1977). In my opinion there is a world of difference between conduct undertaken by state agencies of their own free will, and conduct required of state agencies by federal courts.
 
 
 82
 As pointed out in the majority opinion, UT has enjoyed under Tennessee law a unique and distinct place in the state's scheme of higher education, a place apart from that of other institutions and entirely apart from racial factors. The separate systems were not developed to separate black students from white for, in pathetic fact, both systems were originally white. Parallel systems of state supported college education are found extensively throughout the United States. They normally have nothing to do with racial considerations, but rather result from historic developments reflecting the state's diverse needs in the area of higher education. Until a system itself is employed to impose or foster a segregated educational experience, its integrity should be respected by our courts.[11]
 
 
 83
 If there were to be any merger at all, clearly the more logical merger would be to move TSU into UT, for it is TSU which remains substantially disproportionate in its racial composition compared to the remainder of the system. The unworkability of such a merger, however, for practical purposes, is apparent from the record and must have been persuasive to the district court. Both faculty and student admission standards are too widely variant to permit such a merger without causing real loss and genuine deprivation of opportunity for both black students and faculty. I can well understand, therefore, that such a plan would necessarily not be attractive. Efforts to work a De facto merger by interchange of programs and the like were unsuccessful, as pointed out by the majority opinion, although the reasons for assigning the fault to UT-N is not apparent. The overriding truth remains that the racial identifiability of TSU has thus far impaired its attractiveness to white applicants.
 
 
 84
 Accordingly, I would vacate the judgment of the district court and remand for further proceedings. Those proceedings should consist of the entry of appropriate injunctive relief to confine UT-N to those courses and activities which were offered prior to the expansion in 1969. See Norris v. State Council of Higher Education, supra, 327 F.Supp. at 1370. If this seems unduly harsh for UT-N, it can only be said that UT-N was fairly warned of this possible result by the timely commencement of this litigation. This does not seem too onerous a burden if TSU's opportunity to survive as an integrated university is to be protected. Should UT-N not be satisfied with this, there always remains available to it the opportunity to enter into an agreement with TSU such as that which is now in effect in Memphis between UT and Memphis State University.
 
 
 85
 From the foregoing it must be apparent that the heaviest burden in the instant litigation remains upon TSU. This burden compels TSU to make itself attractive to a somewhat diminishing body of potential applicants for admission by proceeding as promptly as possible to integrate its faculty and staff. With UT-N enjoined from encroaching upon programs which are designed to attract white students, TSU's good faith efforts to desegregate should meet with success.
 
 
 86
 If TSU is otherwise operated in a non-discriminatory manner and if the vacancies on the faculty and staff are filled on a racially neutral basis, I am of the opinion that the commands of the Constitution will have been honored. While one may with great logic be persuaded that the racial makeup of the student body of TSU should be more representative of the racial population of the community as a whole, I would not require it as long as any racial imbalance is the product of personal choice and is not compelled by or the result of state action. Are we to tell some black applicant that he may not attend TSU or some white applicant that he must? This proclivity may indeed be a vestige of historical discrimination, and I fervently decry it, but it is a vestige which remains not in the education system but in the hearts of those who seek to enter it.
 
 
 
 [1]
 Compulsory racial segregation in all Tennessee institutions of higher learning was first mandated by Article 11, § 12 of the Tennessee Constitution of 1870. In 1901 Tennessee became the first state to enact criminal statutes requiring racial segregation in all public and private colleges. 49 Tenn.Code Ann. §§ 3701-3 (Unconstitutional)
 
 
 [2]
 The commentators who have dealt with this subject have uniformly concluded that ASTA was too restrictive in dealing with the affirmative duty to remove vestiges of a state-imposed dual system of public higher education. See Note, The Affirmative Duty to Integrate in Higher Education Note, 79 Yale L.J. 666-697 (1970); Note, Integration of Higher Education in the South, 69 Colum.L.Rev. 112 (1969); Desegregation-College's Duty to Take Affirmative Action to Integrate Beyond the Institution of a Non-Discriminatory Admissions Policy, 4 Harv.Civ.Rights Civ.Lib.L.Rev. 443 (1969). The one article dealing with Norris found its requirements distinctly preferable to those of ASTA. See Comment, Integrating Higher Education: Defining the Scope of the Affirmative Duty to Integrate, 57 Iowa L.Rev. 898 (1972)
 
 
 [3]
 The findings of the district court in this regard were similar to that of the court in Norris, supra, which stated:
 (O)ne agency of the state, Bland (the white college), cannot impede another agency of the state, Virginia State (the black college), in its efforts to fully integrate its student body. 327 F.Supp. at 1373.
 
 
 [4]
 "No single tradition in public education is more deeply rooted than local control over the operation of schools; local autonomy has long been thought essential both to the maintenance of community concern and support for public schools and to quality of the educational process." 418 U.S. at 741-42, 94 S.Ct. at 3125, 3126. (citation omitted)
 
 
 [1]
 Milliken v. Bradley, 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977) (Milliken II ), found the Supreme Court reaffirming its holding in Milliken I. The Court stated:
 The well-settled principle that the nature and scope of the remedy are to be determined by the violation means simply that federal-court decrees must directly address and relate to the constitutional violation itself. Because of this inherent limitation upon federal judicial authority, federal-court decrees exceed appropriate limits if they are aimed at eliminating a condition that does not violate the Constitution or does not flow from such a violation, see Pasadena Bd. of Education v. Spangler, 427 U.S. 424 (96 S.Ct. 2697, 49 L.Ed.2d 599) (1976), or if they are imposed upon governmental units that were neither involved in nor affected by the constitutional violation, as in Milliken I, supra. Hills v. Gautreaux, 425 U.S. 284, 292-296 (96 S.Ct. 1538, 47 L.Ed.2d 792) (1976).
 433 U.S. at 281-82, 97 S.Ct. at 2758. See also Swann v. Charlotte-Mecklenburg Bd. of Educ., 402 U.S. 1, 16, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971).
 
 
 [2]
 Art. 11 § 12 of the Tennessee Constitution of 1870; Tenn.Code Ann. §§ 49-3701-703. Laws requiring segregation of the races in Tennessee were held to be unconstitutional in Roy v. Brittain, 201 Tenn. 140, 297 S.W.2d 72 (1956). Cf. Booker v. Tenn. Bd. of Educ., 240 F.2d 689 (6th Cir.), Cert. denied, 353 U.S. 965, 77 S.Ct. 1050, 1 L.Ed.2d 915 (1957)
 
 
 [3]
 In 1971 UT-N became a degree granting institution, entrusted to the management and control of the Board of Trustees of the University of Tennessee. Tenn.Code Ann. § 49-3352 (1977)
 
 
 [4]
 To the extent that the vestiges of discrimination remain from the prior system of De jure discrimination, I recognize that the state has a duty to take affirmative steps to eradicate those vestiges. Green v. County School Bd., 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968)
 
 
 [5]
 In Wright v. Council of the City of Emporia . . . and in United States v. Scotland Neck Board of Education . . . the Supreme Court refused to permit the establishment of separate school districts within a single county, even though authorized by state law, where it was found that this would impede the process of dismantling a segregated school system. By analogy no justification appears for permitting (UT and the State Board of Regents) to remain completely autonomous if the effect is to impede the process of desegregating the schools
 Newburg Area Council, Inc. v. Bd. of Educ., 510 F.2d 1358, 1361 (6th Cir. 1974), Cert. denied, 421 U.S. 931, 95 S.Ct. 1658, 44 L.Ed.2d 88 (1975).
 
 
 [6]
 Newburg Area Council, supra, cited by Judge Lively as authority for the interdistrict remedy, dealt with a situation where an interdistrict remedy was found to be appropriate. There, both the Louisville and Jefferson County School Districts were expressly found to have failed to eliminate vestiges of De jure segregation. In fact, the two districts had combined their efforts to segregate the races
 For example, in pre-Brown days black high school students in the Jefferson County school district were sent to the black Central High School located in the Louisville school district. This was done because the county had no black high school, and it was done on a tuition basis paid by the county. While this action by itself might be insufficient to invoke the equitable power of the court, See (Milliken I,) 418 U.S. 717, 94 S.Ct. 3112 (41 L.Ed.2d 1069), there are other instances in the present case of disregarding school district lines. Atherton High School is an example. Atherton is a high school belonging to the Louisville school district, but it was and is located outside the boundaries of that district and within the territory of the Jefferson County school district. Students from both school districts have been permitted to attend the school.
 510 F.2d at 1360. Thus, it was clear that the two districts assisted each other in perpetrating the racial segregation.
 In Milliken I, however, the Court was faced with quite a different situation. There, the school districts outside Detroit were not found to have committed acts of De jure discrimination. The Supreme Court held that the imposition of the interdistrict remedy did not go to meet the constitutional violation within the City of Detroit.
 The situation presented by the instant litigation more nearly resembles Milliken I than Newburg Area Council. The acts of UT did not create the segregation at TSU. Certainly UT's history shows an obedience to Tennessee law in the commission of acts of De jure discrimination, and the vestiges of those acts are properly the subject of the remedial action mandated in the companion-Richardson case. And, to the extent that UT's and UT-N's actions have competed with TSU for white students, thereby hampering TSU's desegregation efforts, UT-N may have violated its constitutional duty. Nevertheless, to find that UT, through the establishment of the Nashville Campus, either created or, in the non-competing areas, contributed to the segregation of TSU is beyond basis in this litigation. To go further than preventing UT-N from hindering the desegregation effort at TSU finds the court imposing a remedy that exceeds any constitutional violation by UT or UT-N.
 
 
 [7]
 As the following table indicates, the integration effort for UT and UT-N was producing acceptable results
 Black Enrollment Black Faculty Black
 as % of as % of Administrators
 Total Enrollment Total as % of Total
 UT UTN TSU UT UTN TSU UT UTN TSU
 1969 3.2 7.4 99.0 1.7 NA 95.0 2.5 NA 100.0
 1970 3.6 5.7 98.5
 1971 4.1 8.7 97.7 1.8 1.7 89.1 3.3 0.0 98.5
 1972 4.5 10.9 95.7
 1973 5.1 10.4 93.1 2.6 3.1 78.2 4.7 0.0 93.7
 1974 5.7 10.5 87.6 3.0 4.9 70.3 5.6 2.1 78.1
 1975 6.4 12.7 85.0 3.1 4.1 68.8 5.8 4.9 88.5
 And, Judge Lively notes that the appellants point out that both TSU and UT-N had a larger percentage of "other race" students at the time of the 1977 hearing than any of the other public institutions. Majority opinion at 1064.
 
 
 [8]
 See note 7, Supra
 Although TSU has been slowly desegregating its student body, TSU has not approached the degree of success enjoyed by UT-N in attracting a student body whose racial composition approximates that of the relevant population. The argument that TSU is integrated because it has one of the largest "other race" representations in its student body merely serves to confuse the issue. "Other race" must mean "other than the majority race in the relevant population" to allow meaningful comparisons of the results of desegregation. As quoted in note 7, "other race" does not mean this, and thus the implied representation that TSU is thereby integrated is unfounded. As the district court concluded, "(d)esegregation at TSU, except for faculty, has been minimal . . . ." Geier v. Blanton, 427 F.Supp. 644, 660 (M.D.Tenn.1977).
 
 
 [9]
 Numerous witnesses testified about the importance and desire of retaining black identity and control at TSU. As examples, consider the following testimony. Frederick Humphries, the President of TSU, stated:
 It is an especially pertinent question for Tennessee State that it be given the opportunity (to expand) because the damage to black people, you know, can an institution which has black administration, a black department chairman, black deans go into the future and become a very strong and creative part, you know, and have a chance of becoming the strongest institution in the higher educational system?
 Now, that is important to preserve because it has a whole lot of impact for a lot of black kids in the society. When you start denying that opportunity and constraining that opportunity you are messing with a psychological aspect of a whole lot of people. Which, you know, the question is: Would they have made it if they had been given the opportunity? All right.
 The Nashville area desegregation deals with a whole lot of things that is going to have a whole lot of impact on a lot of people. It is particularly important for black people because Tennessee State was identified in the past with them. And it is important that they be given the opportunity to become the kind of institution that it can become.
 Manlon J. Griffith, employed by TACTICS, an organization basically providing technical assistance to black colleges, testified:
 I feel very seriously that our black colleges are threatened by integration . . . and in so doing the leadership potential of the black race and in this country is diminished and will continue to diminish and will be obliterated in the course as it is seemingly going. . . . If they should eliminate our college, they will have eliminated black people from any meaningful participation in our democracy.
 Dr. Elias Blake, Jr., the head of the Institute for Services to Education, an organization devoted to research and development related to expanding equal opportunity, primarily for blacks, testified in response to the quoted question:
 Q. Some of these values which you testified may be lost, I mean about black expertise and black culture and so on, may be lost if Tennessee State University is immediately made into a white university. A. Yes, I would be opposed to any order which said that by such and such a time it must be eighty percent white. I think that to do that it would create serious problems in terms of continued education.
 In addition, the majority opinion notes that the UT-N TSU merger plan "provides for an implementation committee made up of members from SBR, UT Board and THEC, a majority of whom may be black." Majority opinion at 1064.
 
 
 [10]
 See Milliken I, supra, 418 U.S. at 745, 94 S.Ct. 3112
 
 
 [11]
 The Supreme Court, in Milliken I, recognized the broad powers properly vested in the states to structure their educational systems to fit the particular needs of their citizens. In describing one of the reasons why the interdistrict remedy was inappropriate, the Court stated:
 . . . it is obvious from the scope of the interdistrict remedy itself that absent a complete restructuring of the laws of Michigan relating to school districts the District Court will become first, a De facto "legislative authority" to resolve these complex questions, and then the "school superintendent" for the entire area. This is a task which few, if any, judges are qualified to perform and one which would deprive the people of control of schools through their elected representatives.
 418 U.S. at 743-44, 94 S.Ct. at 3126-3127.